(No. 40038.—

MARVIN L. PICKERING, Appellant, *vs.* BOARD OF EDUCA-TION OF TOWNSHIP HIGH SCHOOL DISTRICT 205, Appellee.

*Opinion filed January 19, 1967.—Rehearing denied March 27, 1967.*

SCHAEFER, J., and SOLFISBURG, C.J., dissenting.

LIGHTENBERG, GOEBEL & DEJONG, of Chicago, (JOHN LIGHTENBERG and ANDREW LEAHY, of counsel,) for appellant.

JOHN VERKLAN and LOUIS R. BERTANI, both of Joliet, for appellee.

Mr. JUSTICE KLINGBIEL delivered the opinion of the court:

Marvin L. Pickering, a teacher in Township High School District 205, Will County, was dismissed from his position by the Board of Education. He brought proceedings for reinstatement but after a hearing the board confirmed the dismissal. On review the circuit court affirmed the board's decision, and plaintiff Pickering has taken further appeal directly to this court, claiming a constitutional question is involved.

He was dismissed after publishing a letter in the local newspaper criticizing the school board and the district superintendent of schools. On February 25, 1961, the voters of the school district turned down a proposal for the issuance of $4,875,000 in school building bonds to erect two new schools to accommodate freshmen and sophomores only to feed existing Lockport Central High School, which was then to accommodate juniors and seniors only. Upon defeat, this program was discarded. On December 2, 1961, the voters approved the issuance of such bonds in the amount of $5,500,000 to erect two new schools, one (Lockport East) to accommodate freshmen and sophomores only,

which was to operate as a feeder school to Lockport Central, and the other (Lockport West) to be a full four year high school. Existing Lockport Central was then to accommodate juniors and seniors only on the East side of the district. The two programs were distinct and materially different in approach to the same purpose of providing all children of the district with a good common school education.

The letter published by the plaintiff reads as follows:
"Dear Editor:

I enjoyed reading the back issues of your paper which you loaned to me. Perhaps others would enjoy reading them in order to see just how far the two new high schools have deviated from the original promises by the Board of Education. First, let me state that I am referring to the February thru November, 1961 issues of your paper, so that it can be checked.

"One statement in your paper declared that swimming pools, athletic fields, and auditoriums had been left out of the program. They may have been left out but they got put back in very quickly because Lockport West has both an auditorium and athletic field. In fact, Lockport West has a better athletic field than Lockport Central. It has a track that isn't quite regulation distance even though the board spent a few thousand dollars on it. Whose fault is that? Oh, I forgot, it wasn't supposed to be there in the first place. It must have fallen out of the sky. Such responsibility has been touched on in other letters but it seems one just can't help noticing it. I am not saying the school shouldn't have these facilities, because I think they should, but promises are promises, or are they?

"Since there seems to be a problem getting all the facts to the voter on the twice defeated bond issue, many letters have been written to this paper and probably more will follow, I feel I must say something about the letters and their writers. Many of these letters did not give the whole story. Letters by your Board and Administration have stated that

teachers' salaries total $1,297,746 for one year. Now that must have been the total payroll, otherwise the teachers would be getting $10,000 a year. I teach at the high school and I know this just isn't the case. However, this shows their 'stop at nothing' attitude. To illustrate further, do you know that the superintendent told the teachers, and I quote, 'Any teacher that opposes the referendum should be prepared for the consequences'. I think this gets at the reason we have problems passing bond issues. Threats take something away; these are insults to voters in a free society. We should try to sell a program on its merits, if it has any.

"Remember those letters entitled 'District 205 Teachers Speak', I think the voters should know that those letters have been written and agreed to by only five or six teachers, not 98% of the teachers in the high school. In fact, many teachers didn't even know who was writing them. Did you know that those letters had to have the approval of the superintendent before they could be put in the paper? That's the kind of totalitarianism teachers live in at the high school, and your children go to school in.

"In last week's paper, the letter written by a few uninformed teachers threatened to close the school cafeteria and fire its personnel. This is ridiculous and insults the intelligence of the voter because properly managed school cafeterias do not cost the school district any money. If the cafeteria is losing money, then the board should not be packing free lunches for athletes on days of athletic contests. Whatever the case, the taxpayer's child should only have to pay about 30¢ for his lunch instead of 35¢ to pay for free lunches for the athletes.

"In a reply to this letter your Board of Administration will probably state that these lunches are paid for from receipts from the games. But $20,000 in receipts doesn't pay for the $200,000 a year they have been spending on varsity sports while neglecting the wants of teachers.

"You see we don't need an increase in the transportation

tax unless the voters want to keep paying $50,000 or more a year to transport athletes home after practice and to away games, etc. Rest of the $200,000 is made up in coaches' salaries, athletic directors' salaries, baseball pitching machines, sodded football fields, and thousands of dollars for other sports equipment.

"These things are all right, provided we have enough money for them. To sod football fields on borrowed money and then not be able to pay teachers' salaries is getting the cart before the horse.

"If these things aren't enough for you, look at East High. No doors on many of the classrooms, a plant room without any sunlight, no water in a first aid treatment room, are just a few of many things. The taxpayers were really taken to the cleaners. A part of the sidewalk in front of the building has already collapsed. Maybe Mr. Hess would be interested to know that we need blinds on the windows in that building also.

"Once again, the board must have forgotten they were going to spend $3,200,000 on the West building and $2,300,000 on the East building.

"As I see it, the bond issue is a fight between the Board of Education that is trying to push tax-supported athletics down our throats with education, and a public that has mixed emotions about both of these items because they feel they are already paying enough taxes, and simply don't know whom to trust with any more tax money.

"I must sign this letter as a citizen, taxpayer and voter, not as a teacher, since that freedom has been taken from the teachers by the administration. Do you really know what goes on behind those stone walls at the high school? Respectfully, Marvin L. Pickering."

The evidence is that the board constructed the two new schools in accordance with its original plans and specifications and that there were only a few deviations of a minor nature, that the Lockport West track is regulation; and that

an auditorium and athletic field for Lockport West were at all times included in such plans and specifications and the program, as such, presented to the public. Architect Moore testified that the buildings were constructed in accordance with the original working drawings which were taken from the preliminary drawings with modifications of only a very minor nature and that Lockport West was to have an auditorium and athletic field from the beginning. Superintendent Blatnik testified to the same effect and that the accusations in plaintiff's letter were false. Architect Moore testified that the Lockport West track was regulation.

Plaintiff testified that he did not look at the original plans and working drawings of Lockport West because he did not have access to them. He further testified that he worked for the passage of each referendum as submitted to the voters and that he reasoned that since the board of education definitely promised that there would be no swimming pools, athletic fields and auditoriums in the building program under the first referendum, and since it had not mentioned anything about them in the second referendum, at least according to his knowledge, that the board of education, by its silence in regard thereto, in effect promised that there would be no such facilities if the second referendum passed. This was his only basis for these accusations. There was no evidence of a promise by the board of education that there would be no auditorium or varsity sports facilities at Lockport West under the second referendum.

As to statements in the third paragraph of plaintiff's letter the superintendent testified that he authored the statements about teachers' salaries with board approval and his statement about the matter was correct and not false. He testified that he obtained the figures from the budget for the fiscal year 1964-1965 under the heading instructional salaries and explained what the figures represented. The purpose of the educational fund tax-rate-increase referendum was to secure additional funds for the district so that it

could pay for additional salaries of new teachers due to the building of two new schools. It had nothing to do with the number of teachers previously employed by the district. He further testified that the figures about teachers' salaries were correct, and there was testimony that the statement attributed to him was not a threat but was merely meant to suggest that teachers would suffer by not being able to obtain things for their classrooms because money would not be available.

As to statements in the fourth paragraph of plaintiff's letter in regard to the necessity of prior approval by the superintendent before district 205 teachers' letters could be published, teacher Florence Lund, who was the chairman of the committee that wrote the letters, testified that there was no such condition precedent to the publication of the letters. And, Superintendent Blatnik testified that teachers did not have to have his approval before letters could be published and that such a statement by plaintiff in his letter was false.

Superintendent Blatnik denied plaintiff's charge that because the board was giving free lunches to athletes on days of athletic contests each taxpayer's child had to pay about thirty-five cents for his lunch instead of thirty cents in order to make up the cost for free lunches of athletes. He explained that athletes did get a small lunch of a sandwich, an apple or a candy bar and milk when they would have to miss supper due to an away game that required considerable travel and that these lunches were paid for at the cafeteria out of the athletic fund from gate receipts. They were only fed thus on trips for games away from home where because of traveling time, it was difficult for them to eat elsewhere. He testified that the loss incurred for operating the cafeterias of both schools for the school year 1963-1964 was $19,464.56, and that the office of Superintendent of Public Instruction attributed this loss to the cost of food.

As to the accusation that the board spent $200,000 a

year for varsity sports while neglecting the wants of teachers, the district's auditor testified that it was not true that the district spends $200,000 a year on varsity sports. He said that for the school year 1963-1964, as indicated by the board exhibit No. 26 admitted into evidence, the board spent $49,554 on varsity athletics broken down as follows: $29,937 for actual athletic expenditures such as equipment, uniforms, *etc.;* $10,142 for transportation and $9,475 for extracurricular salaries for coaches, *etc.* Superintendent Blatnik categorically stated that the accusation was false. He testified that the wants of teachers have not been neglected; that salary schedules have consistently risen over the past nine years; that inspectors from the office of the State Superintendent of Public Instruction have never indicated that the wants of teachers were neglected; that there have always been on file more requests for jobs than job openings; that the district had a turnover of about six teachers a year who left for other positions out of a past average of 132; that he has not been able to give teachers everything they wanted.

Plaintiff's testimony relative to the $200,000 figure showed a different approach in arriving at that figure. In his figure, included were $111,588 for the new tennis court and football field at Lockport West to be paid out of the construction fund from the sale of bonds. Also included were the costs of bleachers for the Lockport West athletic field and a proportionate amount of the architect's fee, both amounting to a total of about $21,000. He admitted, however, on cross-exam' that these were capital expenditures for perman' ments under the building program and the e' t be a yearly one.

As to neg' of teachers, plaintiff stated that he had' ctionary for his room and was turne' teachers' requests were turned down; an en there was a serious gas leak in Mr. Pryor's ry room, the proper authorities were

notified and did nothing about it for an unreasonably long period of time.

As to the accusation of spending $50,000 or more a year to transport athletes home after practice and so on, the district auditor testified that it was not true, that the actual cost for the school year 1963-1964 was $10,142.21 and was less for the preceding year. The auditor further testified that since his firm has been auditing the books for the district, the district has never failed to pay teachers' salaries when they were due; that the district had never issued teachers' orders and never issued tax anticipation warrants up to its legal limit; and that funds were always available to pay current bills and teachers' salaries. Plaintiff on cross-examination admitted that he always received his salary when due. He further admitted that sodding of football fields was never done at a time when the board was unable to pay teachers' salaries.

Other statements and charges made in plaintiff's letter could reasonably have been found to be untrue and misleading but it would unduly lengthen this opinion to relate the evidence in detail.

Plaintiff never made a formal or informal protest or report to any of his superiors about the subject matter of his accusations and charges.

To reverse the judgment plaintiff makes the contention that his remarks and comments are protected by the constitutional right of free speech. He relies principally on *New York Times Co. v. Sullivan,* 376 U.S. 254, 11 L. Ed.2d 686, and *Garrison v. Louisiana,* 379 U.S. 64, 13 L. Ed.2d 125. The *New York Times* case was an action for libel brought by a public official against a newspaper. The United States Supreme Court reversed a judgment for the plaintiff because in its opinion untrue accusations of public officials are actionable only if actual malice is shown. There was no right of employment involved, nor are the school officials in the case at bar seeking damages for libel. The case cited has

no application. The *Garrison* case was a prosecution for criminal defamation in which the defendant, a district attorney, had criticised the official conduct of judges. The Supreme Court of the United States held that criminal sanctions could not be imposed for criticisms of the kind enjoying protection from civil remedies under the *"New York Times* rule." Here again the authority cited is not relevant in the present case. The issue here is not whether the board may be publicly subjected to false accusations but whether it must continue to employ one who publishes misleading statements which are reasonably believed to be detrimental to the schools. Whatever freedom a private critic might have to harm others by the use or misuse of speech, the plaintiff here is not a mere member of the public. He holds a position as teacher and is no more entitled to harm the schools by speech than by incompetency, cruelty, negligence, immorality, or any other conduct for which there may be no legal sanction. By choosing to teach in the public schools, plaintiff undertook the obligation to refrain from conduct which in the absence of such position he would have an undoubted right to engage in. While tenure provisions of the School Code protect teachers in their positions from political or arbitrary interference, they are not intended to preclude dismissal where the conduct is detrimental to the efficient operation and administration of the schools of the district.

Plaintiff further contends his statements were not "knowing or reckless" falsehoods but were substantially correct in their criticisms, and that the board lacked statutory authority to dismiss him. The Teacher Tenure Law was enacted primarily for the protection of Illinois teachers. Its object is to improve the school system by assuring teachers of experience and ability a continuous service based upon merit, and by protecting them against dismissal for reasons that are political, partisan or capricious. (*Donahoo* v. *Board of Education,* 413 Ill. 422.) A teacher may be dismissed,

however, for sufficient cause as provided in the Code, and where the board after a hearing finds that the teacher's conduct is detrimental to the best interests of the schools and students its decision will not be set aside unless it is without substantial support in the record. *Keyes* v. *Board of Education,* 20 Ill. App.2d 504; *Jepsen* v. *Board of Education,* 19 Ill. App.2d 204.

After examining the record in the case at bar, and the minute detail with which counsel have presented their respective versions of the letter's contents, we think the board's decision has not been shown to be against the manifest weight of the evidence. A teacher who displays disrespect toward the Board of Education, incites misunderstanding and distrust of its policies, and makes unsupported accusations against the officials is not promoting the best interests of his school, and the Board of Education does not abuse its discretion in dismissing him. (*Jepsen* v. *Board of Education,* 19 Ill. App.2d 204.) There is nothing in the record before us to indicate malice on the part of the board members toward the plaintiff, nor does it appear that the board's action was impulsive or capricious. The administration of the schools is within the domain of the school board, and courts do not interfere with the exercise of its powers unless it is shown to be capricious or arbitrary.

As we have indicated, the decision to dismiss the plaintiff was not against the manifest weight of the evidence and the circuit court properly refused to set it aside. The judgment is affirmed.

*Judgment affirmed.*

Mr. Justice Schaefer, dissenting:

Several considerations prevent me from agreeing with the result reached by the majority. The School Code authorizes a school board "To dismiss a teacher for incompetency, cruelty, negligence, immorality or other sufficient cause and to dismiss any teacher, whenever, in its opinion, he is not

qualified to teach, or whenever, in its opinion, the interests of the schools require it, * * *". (Ill. Rev. Stat. 1965, chap. 122, par. 10—22.4.) It is not clear to me that by this language the General Assembly intended to authorize a school board to discharge a teacher for criticizing the policies and actions of the board. Such an authorization would tend to cut off a valuable source of information about the conduct of a most important public undertaking. And if the General Assembly did intend to authorize imposition of the ultimate sanction of discharge against a teacher for exercising first-amendment rights, I think that the State and Federal constitutions require a more precise standard than "the interests of the schools".

"We emphasize once again that 'precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.' *N.A.A.C.P.* v. *Button,* 371 U.S. 415, 438. 'For standards of permissible statutory vagueness are strict in the area of free expression. * * * Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.' *Id.,* at 432-433 * * *. When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone * * *.' *Speiser* v. *Randall,* 357 U.S. 513, 526. For 'The threat of sanctions may deter * * * almost as potently as the actual application of sanctions.' *N.A.A.C.P.* v. *Button, supra,* at 433. The danger of that chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being sanctioned." *Keyishian* v. *Board of Regents of University of State of New York,* 385 U.S. 589 (January 23, 1967,) 17 L. Ed. 2d 629, 641.

The charges against the plaintiff were that his letter "contained many untrue and false statements and comments which directly and by innuendo and without justification questioned and impugned the motives, honesty, integrity,

truthfulness, responsibility and competence of this Board of Education and the School Administrators of this District in carrying out their official duties * * * seriously involved and damaged the professional reputations of said Administrators and Board and are and will be highly disruptive to the discipline of the teachers and the morale and harmony among teachers, administrators, Board of Education and residents of this District, and * * * will tend to foment controversy, conflict and dissension among them and jeopardize the welfare of the schools of this District."

These charges were formulated by the very members of the board whose "motives, honesty, integrity, truthfulness, responsibility and competence" were alleged to have been falsely inpugned. The aggrieved members of the board then determined whether the charges that they made had been established by the evidence, and they decided that their "charges on account of said reasons and causes are not remediable", a determination required by statute before the sanction of discharge could be imposed. (Ill. Rev. Stat. 1965, chap. 122, par. 24—12.) The unseemliness, if not the unconstitutionality, of this procedure reinforces my doubt that the General Assembly intended that it should apply to the exercise of first-amendment rights.

But if we assume that the board had the power that it exercised, and assume further that the statements in the letter were untrue, there is still neither charge nor showing that the plaintiff knew that they were false, or that he made them with reckless disregard of their truth or falsity. "Moreover, even when the utterance is false, the great principles of the Constitution which secure freedom of expression in this area precludes attaching adverse consequences to any except the knowing or reckless falsehood. Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas

and ascertainment of truth." *Garrison* v. *Louisiana,* 379 U.S. 64, 72-3, 13 L. Ed. 2d 125, 85 S. Ct. 209.

Finally, in my opinion the board's charges were not established by the evidence. No evidence was offered to show that the letter had any effect whatsoever upon the teachers, the people of the school district, or anyone else. The board's charges alleged specific consequences, but they were not proved, and the board apparently reached its decision upon some theory akin to libel *per se.*

Moreover, as I read the record, the falsity of the principal statements contained in the plaintiff's letter was not established.

(1) Two bond issue referendum elections were held in 1961. The first, on February 25, was defeated; the second, on December 2, was successful. In 1964, proposals to increase the educational and transportation tax rates were twice defeated, on May 23 and on September 19. The plaintiff's letter was published on September 24, 1964. The opinion of the court is based upon the interpretation advanced by the board that the "original promises" of the board, referred to in the first paragraph of the plaintiff's letter, were those made in connection with the building program involved in the second 1961 referendum, and not those made in connection with the first 1961 referendum. On that interpretation the court finds that the plaintiff's statement was false. In my opinion that interpretation is incorrect, because in the context of the two 1961 bond issue proposals it attributes an unnatural meaning to the word "original", and because the plaintiff's letter states that it refers to matters contained in the "February thru November" issues of the paper. The architect testified that his work on plans for the second bond issue was done in the latter half of 1961. It is not disputed that in connection with the February bond issue, under the heading "No Frills", it was represented: "Such items as swimming pools, athletic fields, auditoriums, etc., have been left out of this program to obtain as much

classroom space as possible." The two schools then contemplated were described as containing "Boys' and girls' gym for state required physical education." The two publicity items prepared by the board and widely distributed in connection with the second bond issue also emphasized: "BUT NO FRILLS". They did not, however, mention that there would be an auditorium in the new West High School. Nor did they mention that there would be an athletic field; instead, like the publicity for the first bond issue, they referred to "state required physical education facilities." It seems to me that the evidence shows that the board did not disclose, in the materials that it distributed, that the meaning of "no frills" had changed, and that the auditorium and athletic fields so conspicuously omitted from the first program were included in the second. It does not seem unreasonable to infer, as the plaintiff apparently did, that this lack of candor may have played a part in the defeat of the educational tax rate increases proposed in 1964.

(2) The plaintiff's letter challenged the accuracy of a published letter signed, "Your Board and Administration", which "stated that teachers' salaries total $1,297,746 for one year". In the bill of particulars it furnished, the board said that this statement was false because it "knows of no letter written by either the board or administration that states teachers' salaries for the figure as indicated." But the superintendent's letter of September 18, 1964, addressed to parents and signed "Your Board of Education and Administration," stated that the present educational tax rate "is inadequate to meet the teachers' salaries which alone total $1,297,746." When the superintendent testified he stated that the "figure was correct, but instead of the word 'teachers', it should have said 'Instructional Salaries.'" He explained that the latter category included not only teachers, but also deans, principals, librarians, counselors and four secretaries at each of the three schools. With respect to this

matter the plaintiff was clearly more accurate than the board, and probably no less accurate than the superintendent.

(3) The board charged that the plaintiff's letter falsely stated that the superintendent told the teachers, "Any teacher that opposes the referendum should be prepared for the consequences." The superintendent denied that he made the statement. But another teacher testified that at a meeting of teachers he was struck by the superintendent's statement, "You should be prepared to take the consequences," and jotted it down. As to whether or not the statement could be construed as a threat to teachers who opposed the "bond issue," he was not sure that it was directed at those who opposed it, or meant that any teacher would suffer because he could not obtain things for his classroom. The opinion of the court does not accept the board's denial that such a statement was made, but relies on "testimony that the statement attributed to him was not a threat but was merely meant to suggest that teachers would suffer by not being able to obtain things for their classrooms because money would not be available." Of the three teachers, including the plaintiff, who testified that such a statement was made, one gave it the interpretation stated in the majority opinion, another, "on thinking it over and on talking to other people," was not sure whether it was directed to those who opposed or to all teachers, and the plaintiff interpreted it as a threat to any teacher that opposed. On this evidence the plaintiff's interpretation can hardly be characterized as false.

(4) The substantial truth of plaintiff's charge that letters written by teachers "had to have the approval of the superintendent before they could be put in the paper" is established by the following provision in the Handbook for Teachers of Lockport Township High Schools: "In order to prevent any possible embarassment or misunderstanding, check the material with the building principal before releas-

ing it. Any information which an individual feels should be published in the local papers should be submitted in triplicate to the publicity coordinator." The teacher's letters to which the plaintiff referred were actually submitted to the office of the superintendent before they were delivered to the newspaper.

The specific defects in the East High Building, of which the plaintiff complained, were established. But in other respects the plaintiff's letter was inaccurate. He was wrong on his figures as to the total annual amount spent on varsity sports, because the $200,000 figure he mentioned included capital expenditures. The actual annual expenses were about $49,500. The plaintiff's letter could be read as stating that in the past teachers' salaries had not been paid; on that reading it was not true, for the record shows that teachers' salaries had consistently been paid on time. The cost of sodding the football field was paid with borrowed funds, but this was a capital expenditure. Eliminating free lunches in connection with athletic events would have reduced the cafeteria deficit, but would not have reduced the cost of cafeteria meals from 35 to 30¢.

To be entitled to the protection of the first amendment it is not necessary that the plaintiff's letter be a model of literary style, good taste and sound judgment. In my view it is not, but my view is irrelevant. The letter is substantially accurate, and more important it has not been shown to be knowingly false. Teachers are not necessarily the best critics in matters of school finance and administration, but they are in closer contact with the actual operation of the schools than anyone else and the public should not be deprived of their views.

Under our system of school administration the most important part of the job is done by hard working, conscientious, even consecrated members of local school boards who serve without compensation. It is understandable that they should be quick to take offense at statements which they feel

impugn their motives, honesty and integrity. But they are public officials engaged in the conduct of public business and they cannot be immunized from criticism, even by teachers.

A legislative system which, as in this case, casts them in the role of aggrieved victims who formulate, prosecute and punish charges based on their grievances is not, in my opinion, compatible with present standards of due process. Nor is such a procedure necessary, for charges of this sort could readily be heard and determined by the County Board of School Trustees, the County Superintendent of Schools, or the Superintendent of Public Instruction. The problem is particularly acute when the sanction of discharge is involved, for then the board must determine whether the condition that gives rise to the discharge is remediable. In a discharge case the board has already determined that the condition cannot be remedied, and it is hard to see how members of the board can be expected to review that determination impartially when the conduct upon which the discharge is based involved their personal grievances.

Mr. CHIEF JUSTICE SOLFISBURG joins in this dissent.