Elvin ALBAUM, Plaintiff,

v.

Thomas F. CAREY, Superintendent of Schools of Union Free School District #15, and Arthur Carin, Hal-Curtis Felsher, Howard T. Jankowitz, William Mayhew and Samuel Springer, constituting the Board of Education of Union Free School District #15, Jericho, New York, Defendants.

No. 67 C 583.

United States District Court
E. D. New York.

March 15, 1968.

I. Leonard Feigenbaum, Melville, N. Y., for plaintiff.

Toaz, Buck, Myers, Brower, Bernst & Meservey, Huntington, N. Y., for defendants; Rem V. Myers, Louis C. Bernst, Huntington, N.Y., of counsel.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, New York City, for intervenor-defendant; Joel Lewittes, New York City, of counsel.

WEINSTEIN, District Judge.

Plaintiff, a high school humanities teacher, brings this action against Thomas F. Carey, Superintendent of Schools, and the individual members of the Board of Education of Union Free School District No. 15 to compel Carey to recommend him, and the Board to consider him, for tenure. He seeks to have the provision controlling the superintendent's action, paragraph 2 of section 3012 of the Education Law of New York, McKinney's Consol.Laws, c. 16, declared invalid under the United States Constitution. 28 U.S.C. §§ 1343(3), 1343(4), 2201, 2202, 2281, 2284.

Plaintiff also contends that the failure of the superintendent to recommend him for tenure deprived him of his "rights of free speech and free assembly under the First Amendment." He seeks relief pursuant to sections 1983 and 1988 of title 42 of the United States Code.

The cause is now before this Court on defendants' motion to dismiss the complaint for failure to state a claim on which relief can be granted and plaintiff's cross motion to convene a three-judge court to hear his constitutional challenge to the New York statute. 28 U.S.C. §§ 2281, 2284. The Attorney General of the State of New York has submitted a brief as "intervenor-defendant" supporting defendants' position. For the reasons indicated below, defendants' motion to dismiss is denied and plaintiff's motion to convene a three-judge court is granted.

Defendants also move to dismiss as to the individual members of the Board of Education on the ground that they are neither necessary nor proper parties to this action. Disposition of this motion may depend upon the three-judge court's appraisal of the statute; decision is therefore deferred to a later "stage of the action." Fed.R. Civ.Proc. 21.

According to the complaint, plaintiff was employed as a probationary teacher in the fall of 1964. From "commencement of his employment until December of 1966, all reports and evaluation of the plaintiff by his superiors, including the defendant Carey, consistently rated the plaintiff as superior in virtually every aspect of his performance." This "high praise" allegedly "ceased in December of 1966 immediately after defendant Carey became aware that plaintiff had become the contract negotiator for the Jericho Teachers Association," and plaintiff was

not recommended for tenure the following spring.

## I. MOTION TO DISMISS

Plaintiff states a claim upon which relief can be granted. The complaint can be fairly read to allege that plaintiff—a model teacher—was not granted tenure solely because he participated in a teacher's union in a high level capacity. Within the confines of this complaint, plaintiff would be able to offer proof that he was punished by an agency of the state for merely inviting fellow teachers to his home to extol the virtues of unionization and to urge them to organize.

 Since the federal constitution protects such expression and association from intrusion by the states, plaintiff's allegation that he was denied tenure in a state school solely because he exercised his rights of free speech states a cause of action over which this Court has jurisdiction under the Civil Rights Act. 42 U.S.C. § 1983. See Douglas v. City of Jeannette, 319 U.S. 157, 162, 63 S.Ct. 877, 880, 87 L.Ed. 1324 (1943) ("Allegations of fact sufficient to show deprivation of the right of free speech under the First Amendment are sufficient to establish deprivation of a constitutional right guaranteed by the Fourteenth, and to state a cause of action under the Civil Rights Act, whenever it appears that the abridgement of the right is effected under color of a state statute or ordinance"); Monroe v. Pape, 365 U.S. 167, 171, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961) ("Allegation of facts constituting a deprivation under color of state authority of a right guaranteed by the Fourteenth Amendment satisfies * * * the requirement"); Cooper v. Pate, 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (allegations of deprivation of privilege solely because of prison inmate's religious beliefs states cause of action under 42 U.S.C. § 1983); United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 423 n. 7, 19 L.Ed.2d 508 (1967) ("Our decisions leave little doubt that the right of [free] association is specifically protected by the First Amendment.").

Cf. L. Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum.L.Rev. 1404 (1967).

While the teacher has the same right as any other citizen to speech, his style may "raise grave doubts concerning his fitness for position." I Emerson, Haber & Dorsen, Political and Civil Rights in the United States, 918 (1967). Particularly during the probationary period, the academic community as well as the community at large is justified in observing him and evaluating his judgment as he responds to the pressures of the moment in public discussions. It will be difficult to prove that plaintiff was denied tenure in a public school because he exercised his constitutional freedom as a citizen to speak and not because of myriad reasons of taste and personal predilections. But, as it cannot be said that no possible set of circumstances can be visualized where a constitutional violation was involved, so it cannot be held that this plaintiff cannot possibly succeed in this action. Thus, the request for relief under the Civil Rights Act requires denial of defendants' motion to dismiss.

## II. MOTION TO CONVENE A THREE-JUDGE COURT

Whether plaintiff's challenge to the constitutionality of section 3012(2) of the Education Law of New York requires convening a three-judge court pursuant to sections 2281 and 2284 of title 28 of the United States Code presents a much closer question.

We would find little difficulty in construing the New York statute as denying power to withhold tenure for constitutionally impermissible reasons were it not for the fact that counsel for the state, appearing as "intervenor-defendant," insists that the right to deny tenure is unrestricted in any way. The contention that a school superintendent's power has a significant inhibiting effect on the free speech of probationary teachers would, in short, be of less substance

**6**

had not the state, by its extravagant claims, added weight to that position.

### A. *Statutory Scheme*

Section 3012 of the New York Education Law governs tenure in all Union Free School Districts in New York State with a population of more than 4,500. See generally, Garber and Hageny, The Law and the Teacher in New York State, 73–90 (1967). It provides for a "probationary period of three years" during which the service of a teacher may be "discontinued at any time * * * on the recommendation of the superintendent of schools, by a majority vote of the board of education." N.Y. Education Law § 3012(1). Cf. National Education Association of the United States, Trends in Teacher Tenure 18 (1957) (New York is harsher than other states in permitting dismissal even during school year). At the expiration of this probationary term the superintendent makes a report to the board "recommending for appointment on tenure" those persons who have been found "competent, efficient and satisfactory." N.Y. Education Law § 3012(2). Upon receiving such a favorable report the board may then grant tenure. Tenure prevents removal except for specific causes and after a full hearing. N.Y. Education Law § 3012(2), (3). A teacher with tenure also has substantial rights to appeal after dismissal. N.Y. Education Law § 3012(4).

The challenged paragraph of section 3012 reads as follows:

2. At the expiration of the probationary term of a person appointed for such term, subject to the conditions of this section *the superintendent of schools shall make a written report to the board of education recommending for appointment on tenure those persons who have been found competent, efficient and satisfactory.* Such persons, and all others employed in the teaching, examining or supervising service of the schools of such union free school district, who have served the probationary period as pro-

vided in this section, shall hold their respective positions during good behavior and efficient and competent service, and shall not be removed except for any of the following causes: (a) insubordination, immoral character or conduct unbecoming a teacher; (b) inefficiency, incompetency, physical or mental disability, or neglect of duty. Each person who is not to be recommended for appointment on tenure, shall be so notified by the superintendent of schools in writing not later than sixty days immediately preceding the expiration of his probationary period. (Emphasis supplied.)

### B. *Construction of Section 3012*

It is the position of defendants that "Section 3012 does not furnish any standards to be applied by a superintendent of schools in refusing to recommend * * * for tenure." Brief, p. 9. Moreover, we are told by them that "the New York State Courts and the State Commissioner of Education consistently have held" that a probationary teacher may be fired "at any time * * * without the necessity of providing for a hearing and without assigning any reasons." Brief, pp. 9–10. Finally, the defendants' view of New York law is that a probationary teacher has no right of appeal from an adverse decision either administratively or to the New York Courts. In sum, the superintendent has unfettered and uncontrollable power to fail to recommend plaintiff for appointment with tenure. No constitutional right of plaintiff to due process is violated, defendants argue, because there is no right to government employment and "due process of law is not applicable unless one is being deprived of something to which he has a right." Brief, p. 14.

Plaintiff is in agreement with the defendants that the statutory phrase, "competent, efficient, and satisfactory," places no restrictions on the superintendent's power but he contends that allowing such authority "violates * * * due

process of law * * * by arbitrarily and capriciously depriving plaintiff of his employment." Complaint, p. 3.

■ This Court is not bound, particularly in a case involving the constitutionality of an important state statute, to accept the parties' agreement with respect to the lack of standards binding the superintendent. To say that a court must, in the circumstances of this case, accept a statutory construction proffered by the parties would be to render it impotent to protect those not before the court from the pervasive stare decisis effect of a decision touching the educational structure of New York and the rights of many teachers. Alternative statutory interpretations are not foreclosed to the three-judge court.

The "competent, efficient and satisfactory" language of the statute would seem to refer to objective qualifications including evaluations of in-class performance. Such an interpretation would be consistent with the two-step approach embodied in the statute. The superintendent's recommendation would be a sort of screening device which brought before the Board of Education the names of all those who were qualified by objective standards. The Board's appointment would then take into account the intangible, subjective factors inherent in the difficult choices in a tenure system. This interpretation is the one suggested in a 1945 resolution of the New York State District Superintendents Association. It declared that "the final responsibility for selection of candidates belongs to the boards of education. * * * In cases of difference of opinion a superintendent should refuse to recommend a candidate *only when objective evidence renders such action necessary.*" "Function of the District Superintendent in Relation to the Tenure Law," 21 Journal of the New York State School Boards Association, Inc. 37 (1957) (Emphasis added). See also National Comm'n for the Defense of Democracy Through Education, Bethpage, New York; A Study in Faulty Human Relations 32 (1958) ("Recommendation for granting or with-

holding tenure status should be based on detailed, objective and accurate records. Tenure status should never be withheld as a result of personal or arbitrary reaction to irritating circumstances, or for calculated reprisal.").

New York's statutory scheme of teacher selection might reasonably be interpreted to include a variety of guarantees designed to protect the rights of employees generally. Every New York citizen is guaranteed the right to "speak, write and publish his sentiments on all subjects." N.Y.Const.Art. 1, § 8. "Employees shall," New York's basic charter declares, "have the right to organize and to bargain collectively through representatives of their own choosing." N.Y. Const.Art. 1, § 17. Section 40–a of the New York Civil Rights Law, McKinney's Consol. Laws, c. 6, carrying out the policy against discrimination of section 11 of article 1 of the New York Constitution, provides that "no * * * superintendent * * * shall directly or indirectly ask * * * the religion or religious affiliation of any person seeking employment * * * in the public schools of the state of New York." It is difficult to believe that if a superintendent refused certification under section 3012 on the ground that the religious affiliation of the probationary teacher was contrary to that of most of his students, the teacher would have no remedy. Cf. Bridgman v. Kern, 257 App.Div. 420, 434–435, 13 N.Y.S.2d 249, 262 (1st Dep't 1939) (New York State Constitution prohibits "searching the political opinions of * * * [civil service] candidates in any manner").

■ Similarly, the requirements of the United States Constitution might reasonably be read into the New York statute through the supremacy clause and the well established canon of statutory interpretation requiring courts to reasonably construe an enactment to preserve its constitutionality. See, e. g., Parker v. Board of Education, 237 F.Supp. 222, 227–228 (D.Md.), aff'd, 348 F.2d 464 (4th Cir. 1965), cert. denied, 382 U.S. 1030, 86 S.Ct. 653, 15 L.Ed.2d 543 (1966).

Recently, in Rosenberg v. Allen, 258 F. Supp. 511 (S.D.N.Y.1966), the court considered an attack on the validity of the dismissal of a probationary teacher under section 3012(1) of the New York Education Law. Holding that the complaint did not require convening a three-judge court, the court stated that "[t]here is nothing on the face of the statute in question to suggest even remotely that the enacting legislature intended to confer upon the several boards of education of New York State the power to discharge probationary teachers for reasons which violate the United States Constitution." 258 F.Supp. at 513.

Nevertheless, the position of the Department of Education, the body charged with administering the law, that the superintendent has unlimited power cannot be rejected as untenable for it finds considerable support. See Matter of Board of Education, Union Free School Dist. No. 15, 78 State Ed.Dept.Rep. 78, 79–80 (1957) ("An individual who is to receive such a permanent appointment is one with whom the superintendent must work in close cooperation. If for any reason, the superintendent feels that such cooperation cannot be fully achieved with the individual in question he would not be in a position to make a recommendation. If he were required to state the reasons for a failure to recommend the whole statutory scheme would be set at nought.").

Recently New York State Courts ruled that circulating a letter critical of the school board was sufficient cause to uphold the suspension even of a tenured teacher. In the Matter of Puentes v. Board of Education, 24 A.D.2d 628 (2d Dept. 1965), aff'd mem., 18 N.Y.2d 906, 276 N.Y.S.2d 638, 223 N.E.2d 45 (1966), appeal docketed, 36 U.S.L.Week 3152 (Sup.Ct. Oct. 10, 1967). Despite the dissent of Justice Rabin, adopted by Judges Fuld, Van Voorhis and Bergan, which argued that the letter was, under New York Times Co. v. Sullivan (376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)) and Garrison v. State of Louisiana (379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.

2d 125 (1964)), protected by the First Amendment, majorities of both the lower court and the Court of Appeals held that the criticism was punishable conduct unbecoming a teacher. During World War I, a lower New York Court held that a tenured Latin teacher was "incompetent and inefficient" within the meaning of the predecessor to section 3012 because, following her Quaker beliefs, she refused to urge her students to support the war effort. McDowell v. Board of Education, 104 Misc. 564, 172 N.Y.S. 590 (Sup.Ct.1918).

New York courts have also held that a board of education has full and untrammeled discretion in granting tenure. McMaster v. Owens, 193 Misc. 284, 84 N.Y.S.2d 399 (Sup.Ct.1948), aff'd, 275 App.Div. 406, 90 N.Y.S.2d 491 (3d Dep't 1949) (interpreting similar language in Section 3013 which applies to school districts with populations of less than 4,500).

While section 3012(2), dealing with the critical period between probationary and tenure status, has never been construed by the New York State Courts, no Article 78 proceeding has apparently ever been successfully brought to force a superintendent to recommend a teacher for tenure.

These indicia of New York law give considerable substance to plaintiff's position. In this state of the law it would take a bold teacher to risk his appointment to tenure, and the stigma of failure to be so appointed, by speaking out in favor of causes unpopular with the superintendent. "The result must be to stifle 'that free play of the spirit that all teachers ought to especially cultivate and practice.'" Keyishian v. Board of Regents, 385 U.S. 589, 601, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967).

There is substantial doubt about whether a single federal judge should undertake to construe a state statute so as to avoid a major constitutional issue. We must be mindful that interpreting a statute to avoid a constitutional question is often tantamount to a decision on

the merits of the constitutional issue. Construing a statute to require a hearing for dismissal of probationary employees in order to avoid the question whether the constitution required such a hearing would, for example, have no less impact on the state-wide educational system than a decision that the Constitution itself required the hearing.

If it is the purpose of the three-judge court statute to prevent a single federal judge from making such pervasive rulings, it would appear that the necessity of making a question-avoiding construction would be sufficient reason to convene a three-judge court. Phillips Petroleum Company v. Jones, 147 F. Supp. 122, 125–126 (D.Okla.1955) (three-judge court construes state statute to avoid unconstitutionality). Cf. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 27, 40 (1964). "The crux of the business is procedural protection against an improvident state-wide doom by a federal court of a state's legislative policy." Phillips v. United States, 312 U.S. 246, 251, 61 S.Ct. 480, 483, 85 L. Ed. 800 (1941). Cf. Kesler v. Department of Public Safety, etc., Utah, 369 U.S. 153, 157, 82 S.Ct. 807, 811, 7 L.Ed. 2d 641 (1962) (three-judge court not required where "merely the construction of a state law" is required).

C. *Protection of Teacher's First Amendment Rights*

■ The mere statement of defendants' position that the job of school teacher in public schools is not life, liberty or property within the meaning of the Fourteenth Amendment and that therefore no fair process is due the teacher establishes its untenability. As then Circuit Judge Thurgood Marshall put it, "the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." Keyishian v. Board of Regents, 345 F.2d 236, 239 (2d Cir. 1965). See also Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 219, 97 L.Ed. 216 (1952) ("We need not pause to consider whether an abstract right to public employment exists. It is sufficient to say that constitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary."); Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963) ("It is too late in the day to doubt that liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."); Parker v. Board of Education, 237 F. Supp. 222, 227–228 (D.Md.), aff'd, 348 F.2d 464 (4th Cir. 1965), cert. denied, 382 U.S. 1030, 86 S.Ct. 653, 15 L.Ed.2d 543 (1966). ("The Constitution does place certain limitations, however, on the grounds upon which a public employee can be properly dismissed or such employment refused. It cannot be refused on account of race, color, creed, national origin, membership in a political party or other such discriminatory ground. *Nor can an employee be dismissed because of the exercise of a constitutionally protected right,* such as invocation of the Fifth Amendment or the refusal to take unreasonable loyalty oaths." [footnotes omitted] [emphasis added]). See also Van Alstyne, The Demise of the Rights-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev.1439 (1968).

■ Whether we state the matter in traditional terms—that government largess is a property right within the meaning of the Fourteenth Amendment (see Reich, The New Property, 73 Yale L.J. 733 (1964))—or whether we say that to deprive a government employee of his job for exercising constitutionally protected rights is to deprive him of the liberty guaranteed by that Amendment, or whether we merely reason that all government action with respect to its employees must meet the standards imposed by the Amendment, our conclusion is the same: the federal constitution requires every level of government to afford non-discriminatory and fair treatment, both substantively and procedurally, to all its employees; conditions of

governmental employment may not stifle fundamental liberties. Keyishian v. Board of Regents, 385 U.S. 589, 87 S. Ct. 675, 17 L.Ed.2d 629 (1967); Elfbrandt v. Russell, 384 U.S. 11, 86 S.Ct. 1238, 16 L.Ed.2d 321 (1966); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Cramp v. Board of Public Instruction, 368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961); Torcaso v. Watkins, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961); Shelton v. Tucker, 364 U.S. 479, 81 S. Ct. 247, 5 L.Ed.2d 231 (1960); Wiemann v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952). Cf. United Public Workers of America (C.I.O.) v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 91 L.Ed. 754 (1947).

That the federal courts will adjudicate plaintiff's rights pursuant to the Civil Rights Act may satisfy the minimal requirement that there be some forum in which the constitutional right can be vindicated. Cf. Hart & Wechsler, Federal Courts and the Federal System 312–40 (1952). But the lesson of the evolving body of Supreme Court law protecting fundamental First Amendment rights of free speech and association is that the ultimate availability of such relief to the courageous few who choose to pursue the tortuous and dangerous path leading to it does not sufficiently protect freedoms guaranteed by our Constitution. In Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), and Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), it was held that the availability of a First Amendment defense to a criminal prosecution with eventual review by the Supreme Court was not a sufficiently effective remedy for vindication of rights to free speech because many who might wish to speak out would be unwilling to do so if they had to face the rigors of a criminal prosecution to test their rights. See also N.A.A.C.P. v. Button, 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963) ("The threat of sanctions may deter

* * * almost as potently as the actual application of sanctions").

The Supreme Court has been a particularly jealous guardian of First Amendment rights when academic freedom is threatened. As Mr. Justice Harlan put it:

> When academic teaching-freedom and its corollary learning-freedom, so essential to the well-being of the Nation, are claimed, this Court will always be on the alert against intrusion * * * into this constitutionally protected domain. Barenblatt v. United States, 360 U.S. 109, 112, 79 S.Ct. 1081, 1085, 3 L.Ed.2d 1115 (1959).

See also Shelton v. Tucker, 364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.").

Most writing on academic freedom has dealt with the universities. In Sweezy v. State of New Hampshire (354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957)), for example, the Court spoke of the "essentiality of freedom in the community of American universities." Yet the effect of procedures which smother grade school teachers cannot be ignored. An environment of free inquiry is necessary for the majority of students who do not go on to college; even those who go on to higher education will have acquired most of their working and thinking habits in grade and high school. Moreover, much of what was formerly taught in many colleges in the first year or so of undergraduate studies is now covered in the upper grades of good high schools. At least in recent years, intensive student research and academic excellence in the better senior high schools have required a substantial change in the curriculum of most colleges.

In Shelton v. Tucker (364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)), the court held that requiring a public school teacher to reveal every association to which he "belonged or regularly contributed" during the last five years was

invalid because of the inhibiting effect of such mandatory disclosure on constitutionally protected freedom of speech and association. Similarly, in Cramp v. Board of Public Instruction, (368 U.S. 278, 82 S.Ct. 275, 7 L.Ed.2d 285 (1961)), the dismissal of a public school teacher for his refusal to sign an oath that he had never lent "aid, advice, counsel or influence to the Communist Party" was reversed because the oath had an unconstitutional chilling effect on his First Amendment freedoms.

The considerations which militate in favor of academic freedom—our historical commitment to free speech for all, the peculiar importance of academic inquiry to the progress of society, the need that both teacher and student operate in an atmosphere of open inquiry, feeling always free to challenge and improve established ideas—are relevant to elementary and secondary schools as well as to institutions of higher learning. See Note, Developments in The Law—Academic Freedom, 81 Harv.L.Rev. 1045, 1112–13 (1968) ("The close community involvment in local public schools may lead to excessive control and an atmosphere of repression, thwarting all Creativity and intellectual autonomy."); I Emerson, Haber & Dorsen, Political and Civil Rights in the United States 924 (1967) ("Now, with increased awareness of the vital significance of each stage in the whole educational process, we realize that all educational institutions must be assured of reasonable freedom."). Cf. Joughin, Academic Freedom and Tenure 229 (1967) ("public school teachers * * * do not enjoy the kind of community respect the teacher enjoys in other countries"). Thus, the admonition that "[t]he danger of [the] * * * chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed" is applicable to high school teachers as well as to college professors. Keyishian v. Board of Regents, 385 U.S. 589, 604, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967).

It is against this background that we must assess the substantiality of plaintiff's claim. Of course the issue here is somewhat different than in previous chilling effect cases. In the cited cases, the attack was on the overbreadth of a substantive prohibition. That is, the objection was that the statute challenged impinged upon free speech by imposing sanctions on vaguely and broadly defined conduct or speech. In the present case, no speech or conduct by the probationary teacher is specifically prohibited. Both plaintiff and defendants contend, however, that the statute vests in the superintendent the power to choose at his pleasure what standards he will follow. If the superintendent does in fact have such power, it could be argued that a lack of standards is more dangerous to free speech than vague standards. In any case, the allowance of such broad discretion is vulnerable to the same attack advanced in other chilling cases: "When one must guess what conduct or utterance may lose him his position, one necessarily will 'steer far wider of the unlawful zone * * *.' Speiser v. Randall, 357 U.S. 513, 526 [78 S.Ct. 1332, 2 L.Ed.2d 1460]" Keyishian v. Board of Regents, 385 U.S. at 604, 87 S.St. at 684. See also Baggett v. Bullitt, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964) (chilling effect where "men of common intelligence must necessarily guess at its meaning and differ as to its application").

Tenure decisions present delicate and difficult qustions in any educational system. New teachers will, by their attitudes and views, set much of the tone of the educational experience of generations of students. Clearly the state must be given substantial authority to choose its teachers on the basis of intangibles. In the instant case, the state's submission is that absolute power to deny tenure without compliance with any standards "is of the utmost importance to the operation of the public school system." Brief, p. 10. But see, Note, Developments in The Law--Academic Freedom, 81 Harv.L.Rev. 1045, 1092 (1968) ("Despite the advantages of probation,

there is little reason to give the board unbridled discretion . . . The interest of a probationary teacher and the community in academic freedom requires that some safeguards against arbitrary Board action be provided.")

It may be that precise standards cannot be formulated for determining who shall be appointed to tenure. See Beilan v. Board of Public Education, 357 U.S. 399, 406, 78 S.Ct. 1317, 1322, 2 L.Ed.2d 1414 (1958) ("We find no requirement in the Federal Constitution that a teacher's classroom conduct be the sole basis for determining his fitness. Fitness for teaching depends on a broad range of factors"); Goldsmith v. Board of Education, 66 Cal.App. 157, 168, 225 P. 783, 787 (1924) ("the calling [of a teacher] is so intimate, its duties so delicate, the things in which a teacher might prove unworthy or would fail are so numerous, that they are incapable of enumerating in any legislative enactment"); Zimmerman v. Board of Education, 38 N.J. 65, 183 A.2d 25, 29–30 (1962) (" 'Many intangible qualities must be taken into account, and, since lack of them may not constitute good cause for dismissal under a tenure statute, the [employer] * * * is entitled to a period of preliminary scrutiny, during which the protection of tenure does not apply, in order that it may make pragmatically informed and unrestricted decisions as to an applicant's suitability.' "). See also Byse & Joughin, Tenure in American Higher Education 29 (1959) ("When the particular situation is a decision on tenure, a complex of facts and value systems becomes relevant: the tradition and standards of the institution, the experience and wisdom of the judges, and the merits of the person being judged. The result is hardly something to be measured. This is as it should be in the delicate operation of assessing a professional person."); American Association of University Professors and Association of American Colleges, 1940 Statement on Academic Freedom and Tenure, 51 A.A.U.P. Bull. 388 (1965), reprinted in I Emerson, Haber & Dorsen, Political and Civil Rights in the

United States 916 (1967) ("The college or university teacher is a citizen, a member of a learned profession and an officer of an educational institution. When he speaks or writes as a citizen, he should be free from institutional censorship or discipline, but his special position in the community imposes special obligations. As a man of learning and as an educational officer, he should remember that the public may judge his profession and his institution by his utterances. Hence, he should at all times be accurate, should exercise appropriate restraint, should show respect for the opinion of others, and should make every effort to indicate that he is not an institutional spokesman.") But see, Note, Developments in The Law--Academic Freedom, 81 Harv.L.Rev. 1045, 1092 (1968) (suggesting procedures for protecting the teacher without abandoning discretion in the appointing authority).

■ As one commentator has put it, however, "the impossibility of defining with precision the scope of the employer's appropriate control over the employee is insufficient reason for treating that control as boundless." L. Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum.L.Rev. 1404, 1407 (1967). The challenge presented by the ever increasing role of government in the daily lives of its citizens is whether arbitrary and undesirable intrusion can be prevented by legal safeguards defining the permissible scope of administrative action. See Gellhorn, Poverty and Legality: The Law's Slow Awakening, 9 William & Mary L. Rev. 285, 290 (1968) ("judges have been increasingly and realistically aware that denying a benefit or withholding a privilege can constrain liberties as compellingly as can a penal sanction"); Berger, Administrative Arbitrariness and Judicial Review, 65 Colum.L.Rev. 55, 57 (1965) ("Let administrators who seek shelter for arbitrariness be required to justify themselves. Arbitrariness is too serious to be sheltered on an *assumption* that a particular category requires in-

sulation.") (footnotes omitted) (emphasis in original); H. Jones, The Rule of Law and the Welfare State, 58 Colum.L. Rev. 143, 156 (1958) ("It is the task of the rule of law to see that * * * encounters [with managers of state enterprises] are as fair, as just, and as free from arbitrariness as are the familiar encounters of the right-asserting private citizen with the judicial officers of the traditional law.").

Where the delicate balance between the individual's First Amendment rights and the state's great interest in the effective administration of public schools is to be struck, meeting such a challenge is no easy task. In three recent cases, the highest courts of New York, Illinois, and Alaska have each sharply divided over issues much like those we consider here. See In the Matter of Puentes v. Board of Education, 18 N.Y.2d 906, 276 N.Y.S. 2d 638, 223 N.E.2d 45 (1967), affirming 24 A.D.2d 628 (2d Dep't 1965), appeal docketed, 36 U.S.L.Week 3152 (Sup.Ct. Oct. 10, 1967) (upholding, the chief judge and two associate judges dissenting, the suspension of a high school teacher for circulation of a letter critical of the school board); Pickering v. Board of Education, 36 Ill.2d 568, 225 N.E.2d 1 (Ill. 1967), prob. juris. noted, 389 U.S. 925, 88 S.Ct. 291, 19 L.Ed.2d 276 (1967) (upholding, two judges dissenting, the dismissal of a high school teacher for conduct not "in the interests of the schools" for writing and having published a letter critical of a school board's handling of budgetary matters); Watts v. Seward School Board, 421 P.2d 586 (Alaska 1966), cert. granted, 389 U.S. 818, 88 S.Ct. 84, 19 L.Ed.2d 68 (1967) (upholding, one judge dissenting, the failure to reengage a high school teacher because of his "immorality" in making false and unfair statements critical of the superintendent and in soliciting other teachers' aid in removing him, but unanimously reversing the determination refusing to renew the contract of another teacher who had made statements critical of the superintendent in a speech to members of a longshoreman's union). In the Pickering case, Justice Schaefer, dissenting, noted that "the State and Federal Constitutions require a more precise standard than 'the interests of the schools'." 225 N.E.2d at 7. In Watts, the dissent declared that there was a denial of freedom of speech because "The majority's holding goes a long way in stifling any movement for reform or change in our educational system which happens to originate in the mind of an individual teacher." 421 P.2d at 622–623. All three of these cases are currently pending before the United States Supreme Court. The docketing of the appeal in Puentes, the granting of certiorari in Watts, the noting of probable jurisdiction in Pickering, and the scheduling of oral argument in Pickering and Watts (36 U.S.L.Week 3189 (Sup.Ct. Nov. 11, 1967)), all indicate that important and substantial federal questions are presented by these three cases.

■ Each of these three cases involved action taken with respect to tenured teachers whereas the present case involves probationary teachers. This difference may have some legal significance for every probationary employment necessarily involves some inhibitory effect on the employee. He realizes that he must please his employer if he is to obtain more permanent status. This consideration must be weighed among the others outlined above in the final determination on the merits. The ultimate decision will turn on whether the state has achieved its legitimate objective in a way that does not unnecessarily impinge on free speech and whether the Constitution requires that the unavoidable "chilling effect" on probationary employees be minimized by the articulation of more definite standards and the assurance of effective remedies to enforce these standards. These are substantial federal questions. They should not be decided by a single judge.

A request will issue to the Chief Judge of this Circuit to convene a three-judge court.

So ordered.