**Robert H. HUNTER, Plaintiff,**

v.

**The CITY OF ANN ARBOR, a Michigan Municipal Corporation, Guy C. Larcom, Jr., and James C. Slaughter, jointly and severally, Defendants.**

**Civ. A. No. 36150.**

United States District Court,
E. D. Michigan, S. D.

April 7, 1971.

Order Modifying Order Granting Plaintiff's Motion for Preliminary Injunction April 28, 1971.

Frederick L. McDonald, Hamilton & McDonald, Ypsilanti, Mich., for plaintiff.

Jerold Lax, City Atty., Ann Arbor, Mich., for defendants.

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

FEIKENS, District Judge.

This is an action against the City of Ann Arbor, Michigan; its City Administrator, Guy C. Larcom, Jr.; and the

Director of the City's Department of Human Rights, James C. Slaughter. Plaintiff has alleged that he was fired from his position as Assistant Director of the Department of Human Rights without any justification, solely because he is a black man and because he sought to enforce the City's Human Rights Ordinance in an effort to end discrimination. He further alleges that this firing was done under color of law, without due process being afforded him, and that the manner of his termination has damaged him and will also cause him irreparable injury unless he is granted temporary and permanent injunctive relief.

Plaintiff's application for preliminary injunction was heard, and testimony was taken, on March 17, 18, 19, and 23, 1971. Plaintiff called witnesses to testify as to the events leading up to and following his termination, and he also called an expert witness who testified as to the matter of institutional racism in the City. At the end of plaintiff's case, it appeared that the determination of whether preliminary relief would be granted turned on plaintiff's allegations that the City failed to afford him due process. The defendants, at the court's suggestion, limited their case to testimony bearing on the manner of the plaintiff's termination, and they also presented expert testimony on accepted municipal personnel practices with respect to terminations. In reaching a decision on this motion, the court has limited itself to a consideration of the testimony with respect to procedure, and has not considered the testimony relating to any alleged racially based motivations on the part of the City or its officials. It should be noted that counsel for the City requested and was given an opportunity to put into the record an offer of proof in the form of a written statement in rebuttal to the testimony of alleged discrimination. However, it should also be noted that this opinion is limited to plaintiff's motion for preliminary injunctive relief; that the findings of fact and conclusions of law stated herein are limited to the purpose of the motion, and that they are subject to modification at later stages of the suit.

The findings of fact are as follows: Plaintiff Hunter was employed by the City of Ann Arbor Department of Human Rights as a complaint investigator in 1966, and advanced to the position of Assistant Director. In May 1970, he was appointed Acting Director of the Department by defendant Larcom, the City Administrator. On November 30, 1970, defendant Slaughter assumed the position of Director of the Department, and Hunter resumed his former position as Assistant Director. The duties of the Assistant Director are to assist the Director under the Director's supervision. Hunter performed these duties until January 5, 1971, at which time a dispute arose between Hunter and the defendants.

Slaughter sought the advice of the City's Personnel Director as to how to handle the matter. At the Director's suggestion, Slaughter called Hunter to his office for a conference on January 15, 1971. Subsequent to the conference, on January 18, and after again seeking the Personnel Director's advice, Slaughter sent the following communication to Hunter by certified mail, return receipt requested:

January 18, 1971

TO: ROBERT H. HUNTER, Assistant Director Human Rights Department

FROM: JAMES C. SLAUGHTER, Director [signature] Human Rights Department

RE: ATTENDANCE AND CONFORMITY TO THE RESPONSIBILITIES OF YOUR POSITION AS ASSISTANT DIRECTOR

1. On Monday, January 4, 1971, you did not report for duty at 8:00 a. m. I was informed by the Principal Clerk Stenographer that you were taking the morning off and would be in in the afternoon.

On the above date, you arrived at approximately 12:15 p. m. dressed in slacks, sports shirt and jacket,

but left almost immediately and did not return to the office that day or to my knowledge perform any duties connected with your position.

2. On January 5, 1971, you did not report for duty at 8:00 a. m. I was informed by the Principal Clerk Stenographer that you would be in in the afternoon. You came in at approximately 12:10 p. m. and left shortly thereafter. When I returned from lunch at approximately 2:00 p. m., I was informed that you had taken the rest of the day off on sick leave.

You have continued on sick leave since.

3. On Wednesday, January 13, 1971, I was informed you were seen driving your car during duty hours.

4. On Thursday, January 14, 1971, I observed you at Division and Huron Streets at approximately 12:-00 noon driving your car.

5. I was informed that you were observed in the Golden Falcon during the week of January 11, 1971.

6. On Wednesday, January 13, 1971, you attended the School Board meeting at 7:30 p. m. According to an article in the Ann Arbor News, you participated in the meeting in a manner that is not the present policy of this Department.

7. On January 15, 1971, when at my request you came in to discuss the concerns I had about your absences, I informed you of my concerns and questioned you about your activities, especially as they related to enrollment at the University of Michigan Undergraduate School. You may remember that you had requested permission to work part-time in order to go to school full-time and I refused that request. I informed you at our meeting on January 15, 1971, that I had reason to believe that you had enrolled full-time at the University of Michigan. You stated to me that you had enrolled but not full-time.

I also questioned you about your illness. The only explanation I received was that you are sick and are seeing a doctor. I informed you that I accepted your explanation but, that if you were not being truthful, I was going to request your resignation. You informed me at that point that I could request your resignation if I choose but that I had better be ready to fire you. I informed you that if I requested your resignation I would be able to dismiss you; permitting you to resign would be for your benefit. At this point you have began to shout at me, accusing me of attempting to intimidate you. I consider your action of continuing to shout at me, even after my warning that I considered it insubordinate, an attempt to intimidate me and a serious act of insubordination.

Due to all of the above, I have come to the following conclusions:

1. Your activities in the past two weeks have not been those that are normally acceptable for an employee on sick leave.

2. Your enrollment at the University of Michigan would seem to make it difficult—if not impossible—to fulfill your full-time duties as Assistant Director.

3. Your enrollment at the University of Michigan, knowing my full view on such an eventuality, raises question as to your commitment to the present HRD.

4. You are insubordinate and such conduct is not acceptable in the HRD and will not be accepted from a staff person.

In order to resolve the matters discussed in this memorandum to the mutual benefit of yourself and the HRD, I request that you make any response

you determine appropriate in writing within 10 days of the receipt of this memorandum. I defer further action or discussion of the aforestated matters pending receipt of your response. JCS/

Hunter received the memorandum on January 19.

It was the intention of Slaughter that the requirement of a response "within 10 days" meant within ten calendar days. City Administrator Larcom, who reviewed the memorandum along with the Assistant City Administrator and the Personnel Officer prior to its being mailed to Hunter, thought that it meant ten working days.

After receiving Slaughter's memorandum on the 19th, Hunter retained counsel, and his counsel mailed a letter to Slaughter dated January 27, 1971. The letter advised Slaughter that counsel had been retained in the matter, stated that the charges against Hunter were not based in fact, and requested "for and on his behalf" that a conference be scheduled within two days of Slaughter's receipt of the letter. Slaughter did not receive this letter until February 3, 1971, and it crossed in the mails with a letter that Slaughter had mailed Hunter on February 1, 1971, (fourteen calendar days and ten working days from January 19) terminating him from his employment effective January 29, 1971. Slaughter telephoned Hunter's attorney the day he received the letter on Hunter's behalf and a meeting was scheduled to be held on February 5, 1971, in the office of the City Attorney. On February 5, 1971, Hunter received the letter terminating him from his employment.

The meeting was held as scheduled, and was attended by Hunter, his attorney, Slaughter, and the City Attorney. After the meeting, Hunter's attorney requested a further opportunity to meet with City officials and on February 8 Slaughter sent him a letter stating that his request for additional discussion had been brought to the attention of Larcom, the City Administrator, who had expressed a willingness to discuss the matter further. In this letter, Slaughter reiterated that in his own judgment, ample cause existed for Hunter's termination, based on the matters stated in his January 18 memorandum. Hunter's attorney arranged a meeting with Larcom, which was held on February 10, and though Larcom and Hunter's attorney both expressed a willingness to hold further meetings for the purpose of discussing the termination, none were successfully scheduled. This lawsuit was filed March 5, 1971.

It is found that the City and its officers were not following any particular procedure in this case, although notice is taken of the fact that in cases of this kind a fact-finding hearing had been afforded before the City Administrator and Personnel Administrator at which counsel could be present and notes taken, and that an appeal from that hearing could be taken to the City Council or the Mayor. Indeed, it is interesting to note that the City is in the process of adopting procedures and rules which would cover employees in Hunter's category, and would provide a systematic hearing procedure in event of termination or suspension.

The conclusions of law are as follows:

## I

### Jurisdiction

█ Jurisdiction is present over the parties and the subject matter under 28 U.S.C. § 1331, which gives district courts "original jurisdiction of all civil actions wherein the matter in controversy exceeds the sum of $10,000 * * * and arises under the Constitution * * * of the United States." Hunter has alleged that the City of Ann Arbor and its officials have terminated his employment without affording him due process of law, and also that the City and its officials discriminated against him on account of his race. Clearly, such conduct if proved would be in violation of the Fourteenth Amendment. Further, Hunter alleges that the manner of his termination has damaged him in the

amount of $77,000. These allegations confer jurisdiction, Hicks v. City of Los Angeles, 240 F.2d 495 (9th Cir. 1957); Lowe v. Manhattan Beach City School District, 222 F.2d 258 (9th Cir. 1955); Agnew v. City of Compton, 239 F.2d 226 (9th Cir. 1957).

A further ground of jurisdiction alleged by Hunter is that the actions of the City and its officers are in violation of 42 U.S.C. § 1983,[1] and that therefore this court has jurisdiction to grant appropriate relief under 28 U.S.C. § 1343.[2]

Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), held that a city was not a "person" within the meaning of Section 1983, and thus not subject to suit for damages on Section 1983 grounds. Monroe v. Pape has been consistently cited as prohibiting damage suits on Section 1983 grounds against the states and their political subdivisions, including cities. See, e. g., Egan v. City of Aurora, 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741 (1961), and United States ex rel. Gittlemacker v. Philadelphia County, 413 F.2d 84, 86 (3rd Cir. 1969), and cases cited therein at note 2.

The question of whether Monroe v. Pape should be extended to exclude municipalities from liability in actions seeking injunctive relief rather than damages pursuant to 42 U.S.C. § 1983, has been answered affirmatively by the Court of Appeals for this circuit in Deane Hill Country Club, Inc., v. City of Knoxville, 379 F.2d 321, 324 (6th Cir. 1967), cert. den. 389 U.S. 975, 88 S.Ct. 476, 19 L.Ed. 2d 467 (1967). Other circuits have reached the opposite conclusion, however,

and held that injunctive relief against a city was not precluded by Monroe v. Pape. See, Schnell v. City of Chicago, 407 F.2d 1084, 1086 (7th Cir. 1969), and Adams v. City of Park Ridge, 293 F.2d 585, 587 (7th Cir. 1961), decided by the same court that decided Monroe v. Pape six months after the Supreme Court's decision. In Harkless v. Sweeny Independent School District, 427 F.2d 319 (5th Cir. 1970), it was held that a district court erred in holding that a school district was not included within the meaning of "person" in a suit for equitable relief pursuant to Section 1983. The reason given was that such a construction of Monroe v. Pape went beyond a permissible reading of the Supreme Court's opinion, since the issue was not directly faced and decided in *Monroe*. The Supreme Court denied certiorari in the *Harkless* case, 400 U.S. 991, 91 S.Ct. 451, 27 L.Ed.2d 439 (1971), and it would appear that the question is an open one. It seems that the better reasoning supports the view that Monroe v. Pape did not insulate a city, for all time and in all circumstances, from injunctive orders when that city is acting so as to violate constitutionally protected rights. It is concluded that 28 U.S.C. § 1343 provides an additional basis for jurisdiction as to the injunctive relief sought against the City of Ann Arbor and its officials.

## II

### *The Merits of Hunter's Motion for Preliminary Injunction*

A preliminary injunction will be granted only upon a showing that the plain-

---

1. 42 U.S.C. § 1983 provides that:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

2. 28 U.S.C. § 1343 provides:
 "The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
 * * *
 "(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;
 * * * * "

tiff will suffer irreparable harm and that a likelihood exists that he will ultimately prevail on the merits. The granting or denying of an application is within the sound discretion of the court, and the court must weigh the effect that granting the requested relief will have on the defendants. Corning Glass Works v. Lady Cornella Inc., 305 F.Supp. 1229 (E.D.Mich.1969); Tichon v. Harder, 308 F.Supp. 839 (D. Conn.1970); Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944).

■ Hunter alleges that the City and its officials terminated his employment because of his race. The court makes no finding as to this allegation. He also alleges that by the manner of his termination the City and its officials denied him due process and caused him irreparable harm. As to this allegation it is concluded that the plaintiff has sustained his burden.

■ It is the City's claim that the requirements of due process were satisfied by the manner in which Robert Hunter was terminated. The City correctly points out that due process requirements are flexible and differ in response to the nature of the proceeding and the character of the rights affected. Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). The City further argues that in the situation where a municipality discharges an assistant department head the Supreme Court has determined that due process does not require a hearing, relying on Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

Hunter's case does not fit the facts of Cafeteria Workers. There the Supreme Court was dealing with a summary dismissal power arising from the historically established absolute authority of the commander of a federal military installation. Further, the issue went to the right to challenge the reasons for withdrawal of a security rating, rather than the reasons for loss of employment per se. It would seem that in the present case the power the City claims to summarily dismiss Hunter is of an entirely different character from that of the commander of the Naval Weapons Plant to summarily withdraw the identification badge of a contractor's employee.

Comparing the facts only of Cafeteria Workers to those of this case is not sufficient, however. That case interestingly teaches also that in order to determine the requirements of due process in the discharge of a public employee, a court must apply a balancing process, weighing "the precise nature of the government function involved" against "the private interest that has been affected by governmental action." 367 U.S. at 895, 81 S.Ct. at 1748. By holding that the discharged employee in Cafeteria Workers did not have a right to a hearing, the Supreme Court did not hold that public employees were not entitled to the protection of the Constitution. Rather, the court determined that under its balancing process the proprietary function of the government in protecting the security of a federal installation outweighed the private interest of the employee in being "advised of the specific grounds for her exclusion" and being "accorded a hearing at which she might refute them." 367 U.S. at 894, 81 S.Ct. at 1744. The court concluded that in those circumstances, due process did not require a hearing.

■ To apply the requisite balancing process in this case it is necessary to determine the nature of the government function here involved, the nature of the private interest affected, and the effect that giving protection to the private interest would have on the government function.

It seems clear that the government function involved in this case is that of an employer, and it is the claim of the City that as an employer it needs the power to summarily dismiss its assistant department heads. The City has argued, and its expert witness testified, that if it does not have the power to summarily

dismiss high-level employees, its employer-related function will be severely damaged. Specifically, the City claims that the power of summary dismissal is required to maintain a relationship of trust between its department heads and their immediate subordinates, and also to maintain high levels of morale and efficiency at all levels of employment.

Against this interest, admittedly an important one, must be weighed the interest of Hunter that is being affected by the City's action. Hunter, like any employee, has a purely economic interest in being employed. But although the immediate economic effects of his discharge are substantial, it is clear that his interest involves more than a narrow interest in a particular job. Hunter also has an interest in his future employability. This is an interest which every employee has and which can be adversely affected by any termination. It is, however, particularly susceptible to damage in the case of a person who is seeking employment in high levels of city government, where employability is highly dependent upon professional reputation and past employment performance and where employers can properly demand the fullest disclosure of an applicant's personal and employment history.

■ When the effects of government action on the individual's interest are so wide ranging and basic, it is a constitutional requirement that the government's action not be based on certain types of motives and that it have some rational basis. This was recognized by the Supreme Court in *Cafeteria Workers* when it stated that its decisions in United Public Workers of America (CIO) v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947), and Wieman v. Updegraff, 344 U.S. 183, 73 S.Ct. 215, 97 L. Ed. 216 (1952), demonstrated that:

" * * * the state and federal governments, even in the exercise of their internal operations, do not constitutionally have the complete freedom of action enjoyed by a private employer. * * * We may assume that Rachel Brawner could not constitutionally

have been excluded from the Gun Factory if the announced grounds for her exclusion had been patently arbitrary or discriminatory." 367 U.S. at 898, 81 S.Ct. at 1750.

A number of recent cases have explored the meaning of this statement in *Cafeteria Workers* and discussed the requirements of due process in various cases of discharge of employees by governmental bodies. In Birnbaum v. Trussell, 371 F.2d 672 (2nd Cir. 1966), the court reviewed numerous decisions and concluded that the employee could not be afforded his constitutional rights to a non-arbitrary and non-discriminatory decision without procedural protections.

"The principle to be extracted from these cases is that, whenever there is a substantial interest, other than employment by the state, involved in the discharge of a public employee, he can be removed neither on arbitrary grounds *nor without a procedure calculated to determine whether legitimate grounds do exist. * * ** In this case, there are two substantial interests involved: reputation and the ability to pursue a profession effectively. Both are ordinarily accorded meticulous protection, by the libel laws and the latter, in particular, by the rules designed to prevent direct injury by arbitrary state action. [citing cases]. 371 F.2d 672, 678, and n. 13. (Emphasis added.)

*Birnbaum* was a case in which a medical doctor was discharged from a hospital staff, without a hearing to determine any facts, as a result of charges that he was anti-Negro and that on three specific occasions he had abused Negro hospital workers. The Court of Appeals held that in such circumstances a hearing was prerequisite to discharge.

In Roth v. Board of Regents, 310 F. Supp. 972, 979 (W.D.Wis.1970), the court stated that "[t]he time is past in which public employment is to be regarded as a 'privilege' which may be extended upon any conditions which public officials may choose to impose," and concluded that non-tenured professors in a state uni-

versity were entitled under the Constitution to protection against arbitrary non-retention, and that procedural safeguards against violation of this substantive right were therefore necessary if the constitutional rights were to have any real meaning. The court held that in the circumstances minimal procedural due process required a statement of reasons for non-retention, and a hearing at which the non-retained professor would have the opportunity to submit evidence relevant to the stated reasons. See, also, Gouge v. Joint School District, 310 F. Supp. 984 (W.D.Wis.1970); and Lucas v. Chapman, 430 F.2d 945 (5th Cir. 1970).

■ The rationale of all these cases is that the Constitution protects a governmental employee from a patently arbitrary or discriminatory discharge, since it protects every citizen from harm caused by discriminatory or arbitrary governmental actions. The conclusion that a hearing is necessary in connection with a discharge is in actuality a conclusion that unless such a procedure is afforded, no one will know whether the action taken by the government was discriminatory or arbitrary, and no protection will be given to the employee's right not to be so discharged. This reasoning goes to procedures, and does not attempt to define what reasons a government must have before it discharges an employee. It is not the job of a federal court to decide for a city whether an employee's retention is advisable, and once a procedure is followed that makes it clear that there was a factual basis for the action taken, and that it was not the result of constitutionally impermissible discrimination, the matter is at an end. As the court stated in *Roth, supra*:

> "in applying the constitutional doctrine, the court will be bound to respect bases for non-retention enjoying minimal factual support and bases for non-retention supported by subtle reasons." 310 F.Supp. 979.

It is concluded in this case that plaintiff Hunter is entitled to the substantive constitutional protections discussed in *Cafeteria Workers, supra,* i. e., that he cannot be constitutionally excluded from his employment on patently arbitrary or discriminatory grounds. It is further concluded that the substantive constitutional protections to which he is entitled cannot be afforded him without procedural safeguards, safeguards the like of which were discussed in *Cafeteria Workers, Birnbaum, Roth,* and *Lucas, supra,* and which are calculated to determine whether legitimate grounds for discharge do exist, grounds which are not based on a misapprehension of fact, or on constitutionally inappropriate factors such as race. It is further concluded that to date the procedure followed by the defendants in this case has not afforded Hunter procedural protection of his substantive rights and that the failure to afford such a procedure has caused him irreparable harm.

The City has vigorously resisted this conclusion, and has argued that even if this court concludes that a hearing should have been afforded Hunter, it must also conclude that the procedure thus far had served the purpose of a hearing and also that Hunter's conduct with regard to the matter made it unnecessary for the City to do anything more than it did.

■ It cannot be said that the procedure thus far afforded Hunter by the City served the purpose of giving protection to Hunter's right not to be discharged for arbitrary or discriminatory reasons. At no time before or after his termination was Hunter afforded an opportunity to appear before anyone who had not been involved as an adversary against him in order to refute the charges that had been made. Hunter's conference with Slaughter advised Hunter of the dissatisfaction that Slaughter had with Hunter's performance of his duties. Slaughter's memorandum seems to have served the same function, and the City's contention that Hunter's failure to respond in exact accordance with the terms of the memorandum closed the matter irrevocably is not tenable. The first meeting among Hunter, Hunter's counsel

Slaughter, and the City Attorney was a highly adversary occasion, and at any rate no presentation of evidence relevant to the charges was made. Nor does it seem possible that any presentation of evidence could have been given a dispassionate consideration, given the fact that the City Attorney had at that time already advised Slaughter as to how to proceed in order to effectuate Slaughter's decision to terminate Hunter.

The same problem existed with regard to the meeting between Hunter's attorney and the City Administrator. The City Administrator had also reviewed with Slaughter, prior to the mailing of the memorandum, the procedures Slaughter should follow to effectuate his decision to terminate Hunter. Having done so, it was extremely difficult for him to take a non-adversary view of any evidence that might have been presented, and the meetings with him could no longer be considered to afford a dispassionate review of the decision that was being challenged. At no time was Hunter given an opportunity to appear before anyone who had not previously been consulted with regard to the best method of effectuating his termination. In these circumstances, it is clear that no one before whom he appeared, in person or by counsel, was in a position to reach any conclusion other than the one reached by Slaughter regarding Hunter's performance of his duties at the time the dispute began.

■ With regard to the question whether Hunter's conduct in not seeking further proceedings before City Council or the Mayor compels a conclusion that it was unnecessary for the City to do anything more than it did, it can only be said that it was not Hunter's responsibility to devise a procedure for the City to follow with regard to his case. Rather, it is the City's responsibility to provide Hunter with a hearing that satisfied due process.

Again, no conclusion is intimated as to the ultimate question whether such grounds were present, nor is any direction given or intended to be given respecting what may be proper grounds, except that they cannot be patently arbitrary or discriminatory, wholly unsupported in fact or wholly without reason.

It would seem proper to remark that in any event, it is difficult to see how holding that some factual resolution must be reached regarding the reasons for a municipal employee's discharge will damage the municipality's interest as an employer. Rather, it seems that a city's taking care to act only on the basis of a true state of affairs and to avoid any appearance of improper motives could only add to the morale of city employees and the efficiency of city departments, and to the necessary relationship of trust between department heads and their subordinates. It is clear that the City of Ann Arbor realizes this fact, in that it is now taking steps to provide a grievance procedure covering employees who are not presently under collective bargaining agreements containing grievance procedures. Therefore:

It is ordered that Robert Hunter be reinstated forthwith in the position of Assistant Director of the Human Rights Department of the City of Ann Arbor, which reinstatement shall be retroactive to the date of his termination from that position and that the City of Ann Arbor shall pay and continue to pay to him the same rate and amount of compensation as he had received in that position prior to his termination;

It is further ordered that the City need not require Robert Hunter to engage in active duty in that position;

It is further ordered that nothing in this Order shall be construed to prevent the defendant City or its agents from proceeding with the complete termination of Robert Hunter, including termination of his rights, privileges, and compensation in his position, on the condition that there are observed the requirements of procedural due process as set forth herein.

## ORDER MODIFYING ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The defendant City having filed a Motion for Suspension of Preliminary Injunction in accordance with Rule 62 of the Rules of Civil Procedure and for security in accordance with Rule 65, Rules of Civil Procedure; and the plaintiff having been heard in response thereto; and the court having given the matter full consideration and being again of the opinion that the provisions of Rule 65(c) of the Federal Rules of Civil Procedure with respect to security for costs and damages are not fully responsive to the problems arising upon the entry of an order requiring the reinstatement of an employee and the payment of his salary, therefore,

It is hereby ordered:

1. That as to the period from the date of the City's termination of Robert Hunter to April 7, 1971, the requirement of this court's Order that the City pay Robert Hunter's salary is suspended during the pendency of defendant's appeal. This suspension of payment provides substantial security to defendant;

2. That as to the period beginning April 7, 1971, the City shall forthwith pay and continue to pay Robert Hunter's salary, as required by the Order of this court granting Preliminary Injunction;

3. That said payment of Robert Hunter's salary shall continue at least until the conclusion of such hearing as the City may afford Robert Hunter with regard to his employment status;

4. That the City shall continue to provide to Robert Hunter the full health and medical benefits to which he was entitled as Assistant Director of the Ann Arbor Human Rights Department, from the date of his termination by the City at least until the conclusion of such hearing as the City may afford him with regard to his employment status;

5. That any questions regarding the return by Robert Hunter to the City of Ann Arbor of paid-out retirement benefits shall await the determination of such hearing as the City may afford him with regard to his employment status; and

6. That in view of the provisions for security in Paragraph 1 hereof, Robert Hunter is not required to furnish further security and because of the public nature of the question presented, he is not required to post bond or furnish security for costs.