C. D. (Denny) ABBOTT, Plaintiff,

v.

William F. THETFORD, etc., Defendant.

Civ. A. No. 3847-N.

United States District Court,

M. D. Alabama, N. D.

Jan. 26, 1973.

Howard A. Mandell, Montgomery, Ala., for plaintiff.

Robert B. Stewart and Richard H. Dorrough, of Jones, Murray, Stewart & Yarbrough, Montgomery, Ala., for defendant.

## OPINION

VARNER, District Judge.

This cause is a proceeding by Plaintiff Abbott, Chief Probation Officer of the Circuit Court, Domestic Relations Division of Montgomery County, Alabama, against Defendant Thetford, Judge of that Court, for the allegedly wrongful discharge of Plaintiff by the Defendant for violation by Plaintiff of a departmental order issued by the Defendant to Plaintiff and other employees of that Court. The Judge ordered that his staff not bring suits with possible exceptions. Plaintiff brought suit as next friend for certain minors.

This Court has jurisdiction because of the allegations of violations of 42 U.S.C. § 1983 and the due process clause of the Fourteenth Amendment. The Court in Harrington v. Taft, 339 F.Supp. 670, 672, in reference to a similar case, stated the following:

"The jurisdiction of this court to sit in a § 1983 action is established by 28 U.S.C. § 1343.

"Section 1983 invests the federal courts with the power to enforce the provisions of the Fourteenth Amendment of the Constitution of the United States against 'those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.' Monroe v. Pape, 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961). In the instant case, the plaintiff charges that the manner in which he was deprived of continued employment with the Cranston Police Department constituted a violation of the Fourteenth Amendment, specifically the clause which provides that no State shall 'deprive any person of life, liberty, or property without due process of law.' 'And it is well settled that municipal ordinances and the actions in office of municipal officials constitute state action and are within the prohibition of the Fourteenth Amendment. Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Lovell v. Griffin, 1938, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949.' McCoy v. Providence Journal Co. (1st Cir. 1951), 190 F.2d 760, 764, cert. den. 342 U.S. 894, 72 S.Ct. 200, 96 L.Ed. 669 (1951). Claims of denial of procedural due process arising out of dismissal from public employment are routinely accepted by federal courts as being within the contemplation of § 1983. See Drown v. Portsmouth School District, 435 F.2d 1182 (1st Cir. 1970) (*Drown I*).

"[2] There is no doubt that plaintiff has an interest in being rehired sufficient to prevent the City of Cranston from discharging him *for constitutionally impermissible reasons.* Slochower v. Board of Higher Education of New York City, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956); Johnson v. Branch, 364 F.2d 177 (4th Cir., 1966), cert. denied 385 U.S. 1003, 87 S.Ct. 706, 17 L.Ed.2d 542 (1967); Albaum v. Carey, 283 F.Supp. 3 (E. D.N.Y.1968)."

Plaintiff insists upon the invalidity of the order and the impropriety of his discharge—both as to cause and procedure. He admits the wilful violation of the order but says the order that he not bring suit infringed his alleged right to freedom of speech and right of redress of grievances protected by the First Amendment and "chilled" the rights of the minors for whom he brought the suit to equal protection protected by the Fourteenth Amendment. Plaintiff further says the discharge deprived him of property without due process of law. He alleges that he felt a moral obligation to do what was necessary to provide better facilities for such minors.

The Defendant Judge insists upon the propriety of both the order and the discharge, basing his position on the fact that he was also seeking facilities for the care of neglected black children through amicable means; that Defendant directed that no such suit be filed because Defendant had reason to believe that Plaintiff was considering a suit which would probably defeat Defendant's efforts to obtain such facilities; and that such suit was a wilful violation of his order and would tend to interfere with the effectiveness of his Court unless the Judge disassociated himself from the issues of the suit by discharging Plaintiff. The state law, Act 2280 of the 1971 Legislature, State of Alabama, provides for consideration by a county personnel board of the propriety of departmental orders such as that in question (Subsections 2[c], 11) and of the propriety of the discharge of such personnel (Subsections 9, 10). The Plaintiff failed to avail himself of this administrative remedy. He claims that

the remedy would have been unfair as the Defendant was, as a matter of law, one of the three Circuit Court Judges who jointly appointed one of the three personnel board members.

Evidence tends to show, and this Court finds, that both parties were seeking to obtain better facilities for care of neglected black children. There is no question in this case of the desirability of protection of needy children of all races nor is there any question of their constitutional right to equal protection in the use of public facilities.

## FINDINGS OF FACT

Defendant Thetford is and was at all pertinent times Judge of the Circuit Court of Montgomery County handling all domestic relations and juvenile court problems and the supervisory officer of approximately 40 county employees, including Plaintiff Abbott who, until his discharge on November 17, 1972, served as Chief Probation Officer of the juvenile jurisdiction of that Court.

In 1969, Plaintiff, as Chief Probation Officer and as next friend of minors, had filed a suit (designated as the 1969 suit) against certain state officials, without the consent of Judge Thetford and without having given prior notice to Judge Thetford either of his intention to file the suit or of the specific facts complained of. That suit sought to correct the unsatisfactory commitment facilities for delinquent and neglected children in Montgomery County and to correct certain mistreatment of minor inmates at the Mt. Meigs Industrial School, a state institution for incarceration and treatment of juvenile delinquents. During the pendency of that 1969 suit, the Plaintiff, after having made one or more news releases about the suit and after having been directed by the Judge to give no more news releases, was suspended for 15 days for having given a news release in violation of the Judge's order. After a conference between Plaintiff and Defendant, the suspension was lifted after ten days.

That suit and the surrounding circumstances are relevant only to the parties' knowledge and state of mind in the fall of 1972.

Judge Thetford, upon being informed in October, 1972, that Chief Probation Officer Abbott was spending considerable time in the office of a lawyer known to be interested in civil rights matters and suspecting that he proposed to file another lawsuit, called together three persons, Miss Goodwin, Mr. Franklin and Mr. Abbott, as department heads of court personnel, and issued an order directing that no suit, with possibly some exceptions, be filed by court personnel. While recollections are in conflict as to the conditions of the prohibition, some of the witnesses testified that the prohibition involved only suits which might involve the operation of the Circuit Court and excepted those suits wherein the Judge's previous knowledge and consent was secured. This Court finds that all concerned understood that the type suit intended to be prohibited was any suit that the Judge felt would affect the operation of the Court. Obviously, all parties understood that the purpose thereof was to provide that the Judge have an opportunity to decide the propriety of his assigned personnel's filing suits which the Judge thought might affect the effectiveness of his Court.

Within approximately one month after said order, Mr. Abbott wilfully and knowingly violated the Judge's order by filing the 1972 suit against the Alabama Department of Pensions and Securities and six allegedly private children's homes in Alabama—all of which are facilities of the Thetford Court in the sense that that Court must coordinate regularly with the Department and the Court has an opportunity to place neglected children in its custody with such homes at the homes' discretion.

Several witnesses, both black and white, stated that effectiveness of the Court with the defendant children's homes had not diminished since the suit. The effect of the suit, however, must be considered in light of the fact that Ab-

bott was immediately discharged upon his filing the suit.

At least one of the managers of one of the defendant homes has informed Judge Thetford that his home is supported largely by white donees and that the attempt to judicially integrate the home will seriously curtail donations. Judge Thetford testified that, to his best knowledge, the suit by his Chief Probation Officer would probably adversely affect the relationship of his Court with the several defendant children's homes which have absolute authority to decline for placement at such home any child referred thereto by his Court. He further testified without contradiction that his Court must work closely with the Department of Pensions and Securities. It is argued that someone had to decide whether the Court's function would be better served by working with the predominantly white institutions and trying amicably to get other facilities for blacks or by filing this suit. Abbott is the alter ego of the Judge. Abbott's disapproval of a correctional or custodial institution is often considered to be the Judge's. The Judge's function involves the Judge's support, insofar as his public image is concerned, of public or semi-public correctional and child care institutions. His duties involve sentencing persons to or placing persons in said facilities and an implication follows that these institutions are judicially approved for their purpose. He must work with the authorities in these institutions. The necessity that he work with these authorities is inconsistent with his court's personnel's being involved in litigation adverse to these institutions.

Defendant stated that the primary reason he adopted the rule requiring his consent prior to such lawsuits' being filed by his court personnel was that he had been personally working with a group of people—particularly the Montgomery Kiwanis Club, the Junior League of Montgomery, a Jewish Ladies Group, and the Montgomery Area United Appeal—in an effort to raise money to build, equip and operate a home in Montgomery for neglected black children and that he felt that the filing of such a suit would probably interfere with such a program. The Kiwanis Club had tentatively approved $30,000.00, conditioned on United Appeal's furnishing operating funds for the home. Thetford explained that one defendant in the 1972 suit, Brantwood Nursing Home, is an all-white children's home in Montgomery dependent upon the United Appeal and other private funds for support; that the United Appeal has a policy of not duplicating efforts by supporting two institutions providing the same service; and that should the 1972 suit be successful in integrating Brantwood, United Appeal's policy would forbid their furnishing operating funds for another home for the care of neglected black children in addition to Brantwood and would, therefore, defeat the planned home for black children. Without contradiction, the project has been suspended pending Abbott's suit.

Further reasons for the discharge were as follows:

1. The defendants in the 1972 suit were the Alabama Department of Pensions and Securities and several privately financed child care institutions with which the Montgomery County Family Court might place neglected children. These are agencies not required to accept children from any court, so harmony and good will of the officials thereof is in the best interest of the Thetford Court. Lawsuits usually tend to discourage harmony and good will between the parties.

2. Judge Strickland, an experienced family judge, testified that, in determining policy matters relating to a responsibility to all children, there must be an intra-agency chain of command with final responsibility resting on the person most responsible to the people—that is the judge. Otherwise, employees of the agency may seek the same end by conflicting and mutually detrimental means, thereby defeating a desirable end. Without this authority, employees may

indulge in counteracting efforts, disorganization or even chaos may result and the Court may lose its responsiveness to, and relationship with, the community. Judge Strickland stated that a suit by a family court official against the agencies involved here is disruptive to Court effectiveness and that common sense and responsibility, independent of any rule, should have prohibited such a suit as that filed by Abbott. He and others stated that both the rule against suits and the discharge of Abbott under the circumstances testified to were reasonable.

3. The chief probation officer is the right arm of the Court in which the judge must have great trust. The first action of Abbott in filing suit as Chief Probation Officer to improve Montgomery County Juvenile facilities, when Abbott knew that excellent juvenile facilities were actually being constructed, suggested that Abbott had included that cause for publicity purposes only and caused the Judge to lose faith in Abbott, even though there was merit to the other aspect of the case. The Judge felt that he should, therefore, consider all aspects of any suit Abbott might file which might affect the Court. Judge Thetford testified that, if he saw the need to correct another agency in the interest of minors under Court custody, he tried to do so in private conference with officials thereof and that a lawsuit should be the last resort.

Mr. Abbott implied that he had little faith in his Judge. He said that on other occasions, when he had reported wrongs to the Judge, the Judge was satisfied to report these matters or have Abbott report them to state officials who did nothing about them. He stated that he did not tell Judge Thetford all about the wrongs against the minor plaintiffs in the 1972 suit because he thought the Judge would do no more than quietly encourage the state officials to do better.

In short, the Judge's personality is such that he seeks to right those wrongs brought to his attention by quietly encouraging those responsible to do better and, as he says, by filing a lawsuit "as a last resort". On the other hand, the Probation Officer, having once determined the proper end, proceeds with all available dispatch. The two simply do not agree on means to accomplish an end, and they no longer trust each other. Without trust in such positions, arguably the Court's efficiency will suffer.

## MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

The Defendant moved to dismiss and for summary judgment and insisted on the grounds of comity and lack of exhaustion primarily concerned with the contention that provisions of State Act 2280 of the 1971 Legislature of the State of Alabama provided for consideration of personnel problems of certain classified personnel, including Mr. Abbott, to be determined on the administrative level by a personnel board. Mr. Abbott elected to disregard his right provided by § 2(c) and § 11 of said Act for appeal of the order of Judge Thetford that no employee of the Court should file suit. Mr. Abbott elected also not to proceed under §§ 9 and 10 thereof for review of his discharge by the personnel board. Disregarding his statutory state remedies, he immediately filed his suit in federal court for wrongful discharge.[1]

■■ In a sense, it may be argued that, since Mr. Abbott was not actually Judge Thetford's employee but was an employee of the County, and since all

---

1. To support his motions, Defendant cites the rule set out in Dorsey v. NAACP, 408 F.2d 1022 and Charters v. Shaffer, 181 F.2d 764, 765, that the right of a police officer to be reinstated derives solely from the law of the state, where a state statute provides for reinstatement for wrongful discharge. The wealth of authority, including Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497, may well have justified an initial dismissal of this cause on motion. Minor distinctions in the facts of this case justify a hearing, in this Court's opinion.

Judge Thetford did was to start the wheels in motion for Mr. Abbott's discharge, Abbott's discharge took place because of his refusal to process an administrative appeal to the personnel board as provided by the state law. Defendant's attorneys argue that the Plaintiff, having voluntarily abandoned his state remedies for reinstatement, has no standing to proceed herein. The Defendant asks how one refusing to present his side of a case can complain of a failure of a hearing thereof. While this argument has obvious merit and would logically justify an exception to the general rule,[2] this Court feels bound by prior decisions, under the principle of stare decisis, to the holding that exhaustion of state remedy is not a prerequisite to a proceeding pursuant to 42 U.S.C. § 1983. Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705.

The Defendant further says that there have been a number of case exceptions made to the rule that exhaustion is not required in § 1983 actions and that such cases justify recognition of the following exceptions:

1. If a three-judge court is required, ordinarily no exhaustion is required, whereas if one judge may determine the issues in the federal court, then exhaustion should be required;

2. That the courts favor a requirement of exhaustion of state remedies where a set administrative remedy is available to the plaintiff in the state procedure rather than a judicial remedy; and

3. That the desirability of requiring exhaustion is increased where the plaintiff knowingly and voluntarily abandons his state remedies in order to shop for a federal court which he thinks is more in sympathy with his side of the case.

While some courts have made exceptions to the rule, the Fifth Circuit has not clearly recognized any such exception insofar as this Court can ascertain.

■ The Defendant also contends that this Court should decline to take jurisdiction of this case on the grounds that a substantial and adequate state remedy is available. In this Court's opinion a substantial and adequate state remedy is provided by said statute.

This Court denied Defendant's motion to dismiss and his motion for summary judgment upon the theory that 42 U.S.C. § 1983 is an additional remedy to other remedies available to Plaintiff and that he, therefore, was not required to pursue the State statutory appeal before filing this § 1983 action.

## CONCLUSIONS OF LAW

■ The Plaintiff alleges infringement of his right to free speech, access to the courts and due process of law guaranteed by the First, Fifth and Fourteenth Amendments. These rights must be considered in the light of their relationship to necessary state functions reserved to the states by the Tenth Amendment.

The Supreme Court has articulated the right to continued employment that:

" * * * (C)onstitutional protection does extend to the public servant whose exclusion pursuant to a statute is patently arbitrary or discriminatory." Wieman v. Updegraff, 344 U. S. 183, 191, 73 S.Ct. 215, 219, 97 L.Ed. 216.

■■ The due process clauses of the Fifth and Fourteenth Amendments protect a public employee against impermissible grounds of discharge and improper manner of discharge from public employment, but he must comply with lawful and reasonable terms laid down by

---

2. The suggested exception is that, where the right allegedly invaded involves a hearing provided for by a statutory state procedural hearing conforming to due process and this hearing is not sought by the plaintiff, the plaintiff is no position to prove that the defendant violated his right since an element thereof was a hearing by another which the plaintiff lost by reason of his own inaction.

proper authorities. Slochower v. Board of Higher Education, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692. In Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517, petitioner was reinstated to his public job as due process protected him from removal pursuant to a patently arbitrary statute. See also Schware v. Board of Bar Examiners, 353 U.S. 232, 238–239, 77 S.Ct. 752, 1 L.Ed.2d 796. The due process clause of the Fourteenth Amendment also guarantees access to the courts. Gittlemacker v. Prasse, 428 F.2d 1, 7; Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718. However, there may be a question whether it guarantees such access for the purpose of righting wrongs for persons other than the person seeking to assert the right.

Numerous cases emphasize that, in cases testing the propriety of discharge from public employment because of the exercise of a constitutional right, the importance of that right must be weighed against the right of a government to regulate the individual where a compelling government interest is shown to outweigh the individual interest. United States v. Pipefitters Union, (C.A.Mo.1970) 434 F.2d 1116, adhered to 434 F.2d 1127, cert. granted 402 U.S. 994, 91 S.Ct. 2168, 29 L.Ed.2d 160, reversed on other grounds 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972); American Fed. of Teachers v. School District, (D.C.Colo.1970) 314 F.Supp. 1069; Morales v. Turman, (D.C.Tex.) 326 F.Supp. 677; Wallace v. Brewer, (D.C.Ala.) 315 F.Supp. 431. Defendant insists that he has shown compelling government interests in the necessity for trust between a judge and his probation officer, and in the need for interagency cooperation between the Department of Pensions and Securities, the Thetford Court of which Abbott was the "right arm", and the private homes for neglected children. These compelling government interests may outweigh the interest of Abbott in appearing as next friend for minors in a suit wherein any other adult could have appeared as such next friend.

Plaintiff argues, with commendable zeal, that the rights of black minors to have their civil rights vindicated and the right of Plaintiff to bring a suit to vindicate such rights outweigh any "state interest" allegedly involved.[3] While the civil rights of all are of grave importance to this Court, no clear legitimate reason appears why the minors would have been deprived of their rights had the suit been brought by some person other than a chief probation officer of a court needing the good will of the defendants. The suit is financed by the ACLU, whose members presumably are available for nominal as well as financial support. The files and records of this Court are regularly interspersed with suits brought by members of civil rights organizations, and the organizations, as well as their members, have courageously allowed their names to be used in such litigation. The only substantial evidence offered by Plaintiff as to scarcity of persons to act as next friend for the minors was that Plaintiff went to Attorney Mandel, presumably with expectations of suing as next friend for the then delinquent minor Player, and that he agreed to act as next friend for Coefield and Scott when Father James declined to act.[4] Suffice it to say, there

---

3. Questions to be raised in that suit, for instance, the question of whether the children homes are private in the sense that they are not subject to federal integration requirements, need not be decided in this case.

4. There was some evidence to support the comment in Defendant's brief comparing Father James' reluctance to serve at next friend with Abbott's availability as follows: " * * * Father James decided not to bring suit because he was a Catholic priest, and he felt it would be improper for him to file suit against homes operated by other religions. * * * Comparing Father James' position to that of the Plaintiff we have on the one hand a priest under no orders not to file lawsuits; who is intimately involved with the plight of the minors involved, but who realizes that the filing of such a suit as

was no evidence of any substantial attempt to find any next friend, other than Plaintiff Abbott, for the minors, and both Abbott's evidence and brief of the Plaintiff admit existence of a living father of one minor and a grandmother of another.

This evidence is relevant to show that the interest to be weighed against state interest in this case is the right of Abbott to file a suit for others, not the rights of the minors to have their rights vindicated. There was no substantial proof that the minors would have lost their rights had someone other than Abbott served as their next friend.

Various courts have applied various tests in determining the propriety of discharge of public employees. Some courts seem to rely on what is referred to as the "arbitrary grounds for discharge" test and others apply the "compelling state interest" test. This Court is of the opinion that the facts of this case justify consideration of the "arbitrary grounds" test in weighing the "compelling state interest" involved.

■ In Birnbaum v. Trussell, (2 CCA 1966), 371 F.2d 672, 678; Newcomer v. Coleman, 323 F.Supp. 1363; and Hunter v. City of Ann Arbor, 325 F.Supp. 847, 854, the rule is expounded that, in removal-from-public-employment cases,

> " * * * whenever there is a *substantial interest,* other than employment by the state, involved in the discharge of a public employee, he can be removed neither on *arbitrary grounds* nor without a *procedure calculated to determine* whether *legitimate grounds* do exist." (Emphasis added)

filed by Mr. Abbott might reasonably have an adverse effect upon his church by harming its relationships with other denominations. On the other hand, we have the Plaintiff, a Chief Probation Officer, under a direct order by his superior not to file suits affecting the operations of the Juvenile Court, who has never known nor even seen two of the three minors involved, and whose employer must depend upon the *voluntary* aid of the organizations sued to effectively operate.

In *Hunter,* there were two substantial interests involved other than employment—reputation and the ability to pursue a profession effectively. This Court finds that Abbott's interests involve his desire to obtain adequate facilities for the care of neglected black ·juveniles, the desire for continued employment by the State, and his reputation. Abbott, therefore, meets the "substantial interest" test of *Birnbaum* and *Hunter.*

We turn then to the question of whether Abbott was discharged on arbitrary grounds. The Court in Hunter v. City of Ann Arbor, supra, quoting Roth v. Board of Regents, 310 F.Supp. 972, 979, in seeking to determine what are not "arbitrary grounds" for discharge of public employees, stated that:

> " * * * in applying the constitutional doctrine, the court will be bound to respect bases for non-retention enjoying minimal factual support and bases for non-retention supported by subtle reasons."

One of Judge Thetford's reasons for the rule was that he felt that the filing of the suit by his court personnel would probably interfere with both his relationship with groups his Court must work with and his program of working for facilities, hopefully to be provided by the Kiwanis Club and the United Appeal, which would supplement private facilities for the care of neglected black youths. Evidence shows the Kiwanis program is mired down by the Abbott suit. Judge Strickland, a defense expert witness, phrased the problem by stating that a Chief Probation Officer is the "right arm" of the Court and that his hostile act toward persons upon whom

Considering the evidence in this case, only one conclusion can be drawn concerning the Plaintiff's being in a 'better position' to vindicate rights of Player, Coefield and Scott; that his position as Chief Probation Officer would lend more publicity value to the case; that it would paint the suit with internal factionalization and dispute and provoke controversy within controversy. These were precisely the actions sought to be controlled by the Defendant's directive."

the Court must depend to effect its ends, may be considered as the hostile act of the Court, and necessarily discourages desirable cooperation. This Court is of the opinion that the bases stated by Judge Thetford for nonretention of Mr. Abbott are more than "minimal" and are supported by more than "subtle reasons", other than constitutionally inappropriate factors such as race or suppression of freedom of speech or right to redress of grievances. While racial matters are involved in this case, both Plaintiff and Defendant are of the same race and both were attempting to solve the same problem of shortage of institutional care for neglected black children. Only their methods were in conflict, so it cannot be strongly urged that the discharge was racially inspired.

 The *Birnbaum* tests of "substantial interest" and of "non-arbitrary grounds" having been met, we turn to the question of whether the procedure relating to Abbott's discharge was "calculated to determine whether legitimate grounds do exist" for the discharge. It is axiomatic that no one may be legally divested of his property unless he is allowed a hearing before an impartial tribunal, where he may contest the claim set up against him and be allowed to meet it on the law and facts and show, if he can, that it is unfounded. Hovey v. Elliott, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215; Irons Cliffs Co. v. Negaunee Iron Co., 197 U.S. 463, 25 S.Ct. 474, 49 L.Ed. 836; Ray v. Norseworthy, 23 Wall. 128, 23 L.Ed. 116. If reasonable opportunity for hearing is afforded a person affected by a proceeding, then he has had due process. Lynde v. Lynde, 181 U.S. 183, 21 S.Ct. 555, 45 L.Ed. 810. A full hearing is one in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the step asked to be taken. 16 Am.Jur.2d 977, Constitutional Law, § 572, citing (New England Div. case) Akron, C. Y.

R. Co. v. United States, 261 U.S. 184, 43 S.Ct. 270, 67 L.Ed. 605; Smith v. McCann, 24 How. 398, 16 L.Ed. 714; Wilkey v. State, 238 Ala. 595, 192 So. 588, 129 A.L.R. 549.

This proceeding closely parallels that in Jaeger v. Freeman, (5 CA, 1969) 410 F.2d 528, 531, wherein the Court stated the following:

> "We start with the proposition that due process does not in every instance require the Government to afford a trial-type hearing to an employee before discharging him. Cafeteria & Restaurant Workers Union Local 473, A.F.L.–C.I.O. v. McElroy, 1961, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230. See also Chafin v. Pratt, 5 Cir., 1966, 358 F.2d 349, 356–357, cert. denied, 1966, 385 U.S. 878, 87 S.Ct. 159, 17 L.Ed.2d 105."

The Court system itself will be weakened if a judge, in situations where court efficiency may otherwise suffer, cannot discharge the employees of his court who wilfully disobey rules laid down by the judge and interfere with the effectiveness of the court. While some courts have stated that an opportunity for a hearing must be provided before deprivation of a person's property or liberty, the Supreme Court has stated that due process contemplates that

> " * * * (A)n individual be given an opportunity for a hearing before he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." Boddie v. Connecticut, 401 U.S. 371, 378–379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113, 119; Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556, 571.

Other occasions have been recognized where the hearing need not precede the action, it being sufficient if a review is available. George Moore Ice Cream Co. v. Rose, 289 U.S. 373, 53 S.Ct. 620, 77 L.Ed. 1265; American Surety Co. v.

Baldwin, 287 U.S. 156, 53 S.Ct. 98, 77 L.Ed. 231, 86 A.L.R. 298; Granader v. Public Bank, 281 F.Supp. 120, affm'd. (CA 6) 417 F.2d 75, cert. den. 397 U.S. 1065, 90 S.Ct. 1503, 25 L.Ed.2d 686. The State Act 2280 made such a hearing available to Mr. Abbott.

The principles in Jaeger v. Freeman, supra, are arguably authority for a judgment for the Defendant Thetford on the merits as well as the procedure. But, because of what appears to be some possibly distinguishable aspects, this Court will consider the causes of Abbott's dismissal in the light of other cases.

It is not here suggested by the Plaintiff that the Alabama statute, under which he was afforded the right to hearing, did not provide him an ample opportunity "to make, by evidence and argument, a showing fairly adequate to establish the propriety or impropriety, from the standpoint of justice and law, of the step asked to be taken." He does offer as his reason for not seeking the state remedy that no fair hearing could have been given him since one member of the County Personnel Board was selected by three state circuit judges including the Defendant. In this Court's opinion, that fact does not destroy the adequacy of that remedy though it might have been a consideration in determining whether that particular member should have participated if Plaintiff had sought such a hearing. Absent some showing that the supposedly tainted member would not have recused himself (even assuming his disqualification), this Court will indulge no presumption adverse to the integrity of that Board. This Court is, therefore, of the opinion that the procedure relating to Abbott's discharge was "calculated to determine whether legitimate grounds" did exist for his discharge and that the available hearing was constitutionally sufficient. See 16 Am.Jur.2d Constitutional Law, § 576 at 981. Under the test of the *Birnbaum,* the discharge of Abbott would have been justifiable.

While it may be difficult in some jurisdictions to determine whether to adopt the "reasonable relationship" test or the "controlling public interest" test, the Fifth Circuit Court of Appeals has adopted a procedure in wrongful-denial-of-employment cases which seems to this Court to be reasonable and practical, and it must be considered as binding in this jurisdiction. Ferguson v. Thomas, 430 F.2d 852, 858–859:

"Federal Court hearings in cases of this type should be limited in the first instance to the question of whether or not federal rights have been violated in the procedures followed by the academic agency in processing the plaintiff's grievance. * * * If no federal right has been violated in the procedures followed, then the court should next look to the record as developed before the academic agency to determine whether there was substantial evidence before the agency to support the action taken, with due care taken to judge the constitutionality of the school's action on the basis of the facts that were before the agency, and on the logic applied by it. Johnson v. Branch, supra. If the procedures followed were correct and substantial evidence appears to support the Board's action, that ordinarily ends the matter.

"If the instructor challenges his termination on grounds that his constitutional rights have been infringed, a decision of that claim may and should be avoided, *if valid non-discriminatory grounds are shown to have been the basis of the institution's action.* In closer cases where it is unclear whether a valid basis did exist for the school's action and where the professor's exercise of constitutional rights played an intimate role in the termination decision, the problem should be resolved by striking a balance between the interests on the one hand of the teacher as a citizen in commenting upon matters of public concern and

enjoying freedom of association, and the interests on the other hand of the state as an employer in promoting the efficiency of the public service it performs through its employees. Pickering v. Bd. of Education, supra [391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811]; and Slochower v. Board of Higher Education, 350 U.S. 551, 76 S. Ct. 637, 100 L.Ed. 692, reh. den. 351 U.S. 944, 76 S.Ct. 843, 100 L.Ed. 1470 (1956). See also Scoville v. Board of Education, 425 F.2d 10 (7th Cir. En Banc, 1970)."

This Court has largely disposed of the question whether "federal rights have been violated in the procedures followed" in discharging Abbott. It has long been recognized that elements of a due process hearing are that the subject be furnished a statement of the charges against him, the names and nature of the testimony of the witnesses to testify against him, and an opportunity to present his defenses after a reasonable time for consideration of the charges and witnesses against him. Dixon v. Alabama State Board of Education, 294 F.2d 150 (5 Cir. 1961); Ferguson v. Thomas, 430 F.2d 852 (5 Cir. 1970). Written charges were furnished Abbott. No witnesses or testimony were furnished, nor were they necessary, when the charge was publicly admitted by Abbott. A reasonable time for consideration was offered to Abbott.

■ In the circumstances of Abbott's discharge, there may be other considerations, as suggested in Battle v. Mulholland, (5 CCA) 439 F.2d 321, 324, as follows:

"It is recognized that the state as an employer has an interest in regulating the conduct of its employees in ways which may be more restrictive than those which can be applied to citizens who are not employees. Pickering v. Board of Education, 1968, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811; Tinker v. Des Moines Independ-

ent Community School District, 1969, 393 U.S. 503, 506, 507, 89 S.Ct. 733, 21 L.Ed.2d 731. The problem is to balance the rights of the employees as citizens against the interest of the state in promoting efficient public service. Pred v. Board of Public Instruction, (5 Cir. 1969) 415 F.2d 851, 857."

Turning then to a balance of the rights of Plaintiff to file a suit for others not then within his court's jurisdiction and without any proof that others were not available to file such a suit, against the State's interest in providing homes for neglected black minors and efficient court administration, Abbott's rights pale in comparison. Unlike *Battle* and *Tinker,* there is more than a mere fear or apprehension of interference with a state objective; the proposal for a new black children's home before the United Appeal has been suspended until Abbott's suit against Brantwood is decided. Additionally, the necessary trust between Judge and Chief Probation Officer is no more. The Defendant has carried his burden to show within standards applicable to the relationship between judges and their probation officers that Abbott's conduct has materially and substantially impaired his usefulness as a chief probation officer. See the tests indicated by Battle v. Mulholland, supra, 439 F.2d at 325, citing Tinker v. School District, supra, 393 U. S. at 509, 89 S.Ct. 733.

In *Ferguson,* supra, 430 F.2d at page 859, the court made the following observation:

"Here the proof before the district court showed that Dr. Ferguson exercised his rights of speech and association to such an extent as to seriously impair, if not to destroy, his effectiveness as an instructor in an organized program of academic tutoring. This was his choice to make. The college had no right to control his speech or to curtail his freedom of association,

but they did have a right to terminate his employment as a classroom instructor at the point where the exercise of his constitutional privileges clearly over-balanced his usefulness as an instructor."

This Court finds that Mr. Abbott exercised his rights of free speech, if not his right to access to the courts, in filing suit on behalf of the said minors. This Court further finds that Mr. Abbott's exercise of this right did seriously impair his effectiveness as a probation officer for the Domestic Relations Court of Montgomery County and that, Abbott having made his choice, the Defendant Judge had a right to terminate his employment at the point where "the exercise of his constitutional privileges clearly over-balance his usefulness as" a probation officer.

It is obvious that Judge Thetford, himself, admired the courageous attempts of Chief Probation Officer Abbott to aid youth. Otherwise, he doubtless would never had relieved his suspension in 1969. However, a public employee in exercising his freedoms must remember his obligations to his employment, and when his exercise of his freedoms substantially interferes with his efficiency as a public officer and with the efficiency of the department employing him, his rights must be weighed against the interest of the state in efficient administration.

Mr. Abbott admits that he never explained the particular needs of any of the minors for whom he filed suit to Judge Thetford. His lack of consideration for his employer and for his job are his undoing. In accordance with the foregoing, his relief must be denied. London v. Florida Department of Health & Rehab. Serv., 313 F.Supp. 591, affm'd. 448 F.2d 655; Blackwell v. Board of Education, (5 C.A.1966), 363 F.2d 749; Battle v. Mulholland, supra, 439 F.2d at 325; Parducci v. Rutland, 316 F.Supp. 352, 355.